Filed 7/7/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MIGUEL ANGEL GUILLEN et al.,<br><br>    Defendants and Appellants. | G046163<br><br>(Super. Ct. No. 06CF3677)<br><br>O P I N I O N |

Appeal from judgments of the Superior Court of Orange County, James A. Stotler, Judge. Affirmed as modified.

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant, Miguel Angel Guillen.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant, Garrett Eugene Aguilar.

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant, Stephen Paul Carlstrom, Jr.

Tracy J. Dressner, under appointment by the Court of Appeal, for Defendant and Appellant, Jared Louis Petrovich.

John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant, Raul Villafana.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

\*     \*     \*

On September 14, 2006, John Derek Chamberlain was arrested for possession of child pornography. Twenty-one days later, inmates in Theo Lacy Jail in the City of Orange (TLJ) beat Chamberlain to death because they believed he was a child molester. As waves of inmates hit, kicked, stomped, and did other abhorrent things to Chamberlain over the course of about 30 minutes, three Orange County Sheriff's Department (OCSD) personnel sat in an enclosed guard station approximately 68 feet away. Chamberlain suffered injuries consistent with a high-velocity car accident, including fractures to 21 of his 24 ribs. OCSD was the lead investigating agency and interviewed hundreds of people. After the investigation, Orange County Grand Jury (Grand Jury) proceedings were convened and Grand Jury indictments were returned. As a result of the Grand Jury proceedings, the Orange County District Attorney (OCDA) issued an Investigative Report (the DA Report) and eventually filed a consolidated and amended information.

A jury convicted Miguel Angel Guillen, Jared Louis Petrovich, Garrett Eugene Aguilar, Stephen Paul Carlstrom, Jr., and Raul Villafana of second degree murder of Chamberlain. We refer to them collectively as appellants or defendants depending on the context and in the singular by their last names. A short summary of the issues presented and our conclusions is as follows:

(1) Appellants argue insufficient evidence supports their second degree murder convictions under the prosecution's three theories of second degree murder. We conclude sufficient evidence supports appellants' convictions for second degree murder under each of the prosecution's theories of second degree murder.

(2)  Appellants contend the trial court erred when it denied their motion to dismiss for outrageous government conduct.  We conclude the court properly denied the motion to dismiss because the government's conduct was not so outrageous to warrant dismissal.

(3)  Appellants assert the court committed five evidentiary errors.  We conclude the court committed two evidentiary errors, but appellants were not prejudiced by the errors.

(4)  Appellants argue the court committed one instructional error.  We conclude the court did not err in failing to instruct the jury on one theory of involuntary manslaughter because insufficient evidence supported giving the instruction.

(5)  Appellants contend that after an alternate juror replaced an ill juror, the court instructed the jury to begin deliberations anew but through its statements erred in telling the jury to resume deliberations where it ended.  We conclude the court erred in so instructing the jury, but appellants were not prejudiced by the error.

(6)  Appellants assert the court erred in imposing fines.  We conclude the court erred in imposing fines on Aguilar and Petrovich, and their fines will be reduced.

(7)  Appellants claim there was cumulative error.  We conclude the court's two evidentiary errors and one quasi-instructional error during this lengthy trial do not amount to cumulative prejudicial error requiring reversal.

We affirm the judgments as modified.

FACTS

*I.  Facts of the Offense*

*A.  Theo Lacy Jail's Architecture*

OCSD operates three jails in Orange County, including TLJ, a jail that houses both those charged with crimes and those convicted of crimes.  TLJ inmates are housed in either modules, which are individual cells, or barracks, which are dormitory

3

style.  The barracks are identified by a distinct letter.  F Barracks is divided in half with a wall separating it into equal triangles identified as F Barracks West (F West) and F Barracks East (F East); they are mirror images of each other.  A diagram of the first floor of F West as it existed at the time of Chamberlain's death, which was a trial court exhibit, is attached as appendix A.  Certain modifications to F Barracks have occurred since the time of the incident and are noted hereafter.  At the time of the incident, each half of F Barracks contained a dormitory-style housing unit for 146 inmates, totaling 292 minimum security inmates.

On F West's ground floor are dormitory cubes A through H situated counterclockwise, two bathrooms, and a day room.  The ground floor bathroom between cubes B and C has a hot water faucet.  There are two staircases leading to the second floor where cubes I through P are similarly situated, along with two additional bathrooms.  At the time of the incident, the dormitory cubes had four-foot privacy walls but no doors or bars.  Some of the cubes are larger than other cubes and protrude farther into the day room, creating spots that are not visible from the guard station.  Inmates are issued a uniform, shoes, toiletries, pencil and paper, plastic spoon, and a white cup.

The day room is a large open area where inmates have access to telephones, television, games, cards, and tables.  The day room time is scheduled each day and occurs in one-to-two hour blocks.  It is common for both sides of F Barracks to use the day room and restroom facilities simultaneously.  During day room time, all 292 inmates can roam their respective sides.

In the center of F Barracks' dividing wall, is a hexagonal shaped elevated guard station known as "the bubble."  Access to the guard station is through a door located in a corridor that runs inside the dividing wall and connects to both F West and F East, as well as to the barracks' exterior.  Half of the guard station's windows face F West and the other half face F East.  The guard station windows are opaque, allowing one to view inside only if illuminated.  During day room time, F Barracks can get very

4

loud; inside the guard station it is loud but "somewhat muted." There are a television and chairs in the guard station. The guard station television has the same feed as the inmate television. At the time of Chamberlain's death, there were no surveillance cameras located in F Barracks. There was a camcorder in the guard station that a deputy could use to record unusual incidents.

Because some of the cubes are larger than other cubes, the view of some of the cubes from the guard station is limited. For example, the first floor C cube extends farther than D cube, which from the guard station creates a blind spot on the east side of D cube. From the guard station, a guard can only see part of the top bunk and the top half of an average size man visible over the privacy wall of D cube. In addition, a person seated in the guard station has a limited view of F Barracks, especially of the first floor, because it was hard to see over the counter top. The privacy walls exacerbated the limited view at the time of the incident.

At the time, F Barracks was supervised by two deputy sheriffs and a sheriff special officer (SSO). The deputy sheriffs were in charge of supervising and escorting inmates and were to walk the F Barracks floor every 30 minutes unless assigned to other duties. The SSO remained in the guard station, carried out clerical duties, and did not have direct contact with the inmates. The F Barracks staff monitored inmates using "mod cards" that contained an inmate's photograph and other indentifying information. Sometimes information such as a sex crime charge would be highlighted on a mod card.

B. *TLJ Culture*

Inmates at TLJ, as well as at other Orange County jails, form race-based groups called "CARs," Classification According to Race. The CAR system is an inmate-generated hierarchy divided along racial lines that has existed since the 1950s. In October 2006, the CAR system was present in all Orange County jails and the majority of California jails.

5

In F West there were three CARs each with its own management hierarchy. The three CARs were the Woods, the Paisanos, and the South-Siders. The Woods were the Caucasian inmates, the Paisanos were the Mexican national inmates, and the South-Siders were the Hispanic-American inmates, who were primarily gang members and were the most dominant CAR. Most inmates were members of one of the CARs. Each CAR had a leader, a "shot caller," a second in command, a "right-hand man," an enforcer, a "torpedo," and a person waiting in command, a "mouse." There was also a "house mouse" for the entire barracks who is in charge of cleaning the barracks, distributing commissary slips, and communicating with the deputies about the barracks' needs. Inmates were aware of who occupied the roles and when a change occurred after someone left the barracks.

The shot caller and the right-hand man were responsible for determining which inmates were disciplined or "taxed." Taxing was a form of punishment that included assaults, cleaning duties, squats, or providing items from the commissary. A common form of taxing was "the wall" where two inmates held an inmate against a wall for a specified period of time and hit him below the neck and above the waist while the inmate submitted to the punishment. The shot caller authorized the taxing of inmates who did not follow the jail rules and inmate rules. The shot caller used torpedoes to carry out the taxings.

A CAR mouse would typically approach a new inmate and ask to see the inmate's court documents or "paperwork" to learn the inmate's charges. It was common for inmates to assault other inmates with "sensitive charges" such as child molesters (called "Chesters") and informants (called "Rats"). If inmates became suspicious about an inmate's charges, they attempted to find out the charges often with the help of a third party by checking a public Web site or calling the jail's public information line. All the CARs viewed the assault of inmates perceived to be child molesters or informants favorably. Inmates who failed to produce their paperwork were taxed.

6

For the Woods on October 5, 2006, Petrovich was the shot caller, Aguilar was the right-hand man and torpedo, and Carlstrom was the mouse. Petrovich and Aguilar recently assumed their positions within the Woods. For the Paisanos on that date, Villafana was the shot caller, Salvador Garcia (Chava) was the right-hand man, and Guillen was the mouse. That same day, Deputy Kevin Taylor, Deputy Jason Chapluk, and SSO Philip Le were assigned to F Barracks. Taylor was in command of F Barracks.

OCSD does not condone deputies utilizing the CAR system in the course of their duties. Although inmates tried to hide the workings of the CARs from deputies, deputies, including Taylor and Chapluk, are aware of the CAR management structure. However, deputies are not supposed to authorize or sanction CARs. Deputies are trained that no inmate should have more power than any other inmate. Deputies are trained to treat all inmates equally and not allow any particular inmate to believe he is exempt from the rules. However, because of the number of inmates, deputies used the shot callers to control the inmates because the inmates did not always follow the deputies' orders but they feared the shot callers. Taylor met with the shot callers almost daily and used them to control the barracks, discuss issues, and obtain information. When the deputies had a problem with an inmate, they would likely address the problem with a shot caller or other CAR representative. The deputies would tell the shot caller that a particular inmate was not "'staying with the program'"—i.e., the inmate was making the deputies' job difficult. Deputies did this knowing the shot caller would tax the inmate. Shot callers generally complied with the deputies' directives and were rewarded with additional day room time or extra food. The CARs would have meetings in the day room to disseminate information. The deputies were more tolerant of rule violations by those higher up in the CAR management structure than by other inmates, including cube hopping, which is moving from cube to cube.

*C. Chamberlain's Arrest & Detention*

On September 14, 2006, Chamberlain was arrested for possession of child pornography and booked into Santa Ana jail. On September 18, 2006, Chamberlain was arraigned. On October 2, 2006, Chamberlain appeared in court and his trial was scheduled for October 24, 2006. His defense counsel was Case Barnett. Because of the nature of the charges, Chamberlain was brought into court by himself and not given paperwork to take to jail. Chamberlain was instructed that his charges were sensitive and to not tell other inmates.

On October 3, 2006, Chamberlain was transferred to TLJ and assigned to F West. Carlstrom, the Woods' mouse, approached Chamberlain, and asked him for his paperwork but Chamberlain said he did not have any. Chamberlain told other inquiring inmates he was in custody for violating a restraining order. Later that day, Chamberlain called his girlfriend to tell her that he was worried because inmates were asking him why he was in custody. Chamberlain's girlfriend called Barnett and left him a message stating Chamberlain was afraid because inmates were asking for his paperwork. She left a second message on October 4, 2006.

The following day, Barnett received the message, called TLJ, and spoke with Deputy Adewale Olukoju. Olukoju said they would speak with Chamberlain and consider moving him. Olukoju called Deputy Thomas Sramek in classification, and Sramek called F Barracks. Sramek told Le that the deputies needed to speak with Chamberlain and advise Sramek of the outcome of their conversation. At about 2:30 p.m., Taylor and Chapluk returned to the guard station, and Le told them about Sramek's telephone call. After Taylor and Chapluk performed a mandatory count of the inmates, they opened the day room at 3:00 p.m.

Over the barracks address system, Le told Chamberlain to go to the barracks door. The deputies escorted Chamberlain through a door into the corridor. Neither deputy knew Chamberlain because it was their first day of work that month.

8

Taylor told Chamberlain about the call and asked him if he feared for his safety. Chamberlain explained inmates were pressuring him to produce his paperwork. Taylor asked Chamberlain the date of his next court appearance, and he answered October 24. Taylor asked Chamberlain if he was comfortable remaining in F Barracks until then. Chamberlain said he was because inmates were not expecting him to produce his paperwork until that time. The deputies told Chamberlain that moving him would not benefit him because inmates would ask for his paperwork in any housing unit. The deputies did not intend to move Chamberlain because they did not believe it would protect him. However, deputies had the authority to request Classification place him into protective custody and had the authority to place him in a holding cell while that request was being processed. Taylor suggested Chamberlain tell inmates that deputies informed him about a death in his family. Chamberlain returned to F West. The conversation lasted about 10 minutes.

At about 3:00 p.m., Taylor called Sramek. Taylor said Chamberlain did not have paperwork to show inmates, he would not get it until he returned to court on October 24, and he felt safe until then. Sramek recorded in Chamberlain's records that Taylor spoke with him and he felt safe until his court date. Based on Taylor's report, Sramek decided not to move Chamberlain. On October 5, 2006, there were nine inmates with sensitive sex-related charges housed in F Barracks in addition to Chamberlain. Three were housed in F West, and six were housed in F East.

D. Inmate Assault on Chamberlain

Day room time ended at 4:00 p.m. Inmates had "chow" from 4:00 p.m. to 5:00 p.m., and returned to their bunks to wait for day room time to start. Day room opened at 5:00 p.m., and the inmates poured out of their cubes. Inmates watched a baseball game on the television, played cards and table tennis, read newspapers, used the telephones, and showered.

Andrew Corral, a South-Sider, was on his bunk in D cube playing cards when Aguilar told him to leave because they had business to conduct. Corral moved to the other side of D cube. Corral overheard Petrovich tell Aguilar they were going to beat a "'Chester'" who admitted he likes them young, and Aguilar left D cube. Petrovich, the Woods shot caller remained in D cube, while Villafana, the Paisanos shot caller, and "Stretch," the South-Siders shot caller arrived in D cube. Corral heard them say they were going to beat and rape Chamberlain. They said there was an incentive of 10 commissary items to anyone who raped him. Aguilar went upstairs to J cube to bring Chamberlain to D cube. Aguilar escorted a fully dressed Chamberlain to D cube. As they entered D cube, Aguilar pushed Chamberlain to the floor and the attack began.

Multiple witnesses observed about four groups, totaling at least 30 inmates, enter D cube and assault Chamberlain for about 20 to 45 minutes.

Luis Palacios, a Paisanos, was watching a baseball game about 30 feet away from D cube and saw inmates going in and out of D cube, three or four groups of three or four inmates, taking turns hitting and kicking Chamberlain. Palacios saw Petrovich hit Chamberlain first. Palacios saw Aguilar grab hold of a bunk, elevate himself about three feet, and stomp on Chamberlain. Aguilar also hit him. Palacios described Aguilar as "ruthlessness." Palacios also saw Guillen enter D cube, get on his knees, and make a couple downward striking motions during the beginning or middle of the attack. Guillen was in D cube for at least two minutes. The noise from the barracks muffled Chamberlain's screams and cries for help. Palacios went upstairs and when he looked down he saw Chamberlain trying to crawl under a bunk as inmates continued to hit and kick him. Inmates pulled down Chamberlain's pants, spanked him with a shoe, and spit on him. After Petrovich told Palacios to "'keep walking don't look down[,]'" Palacios returned downstairs. Palacios heard an inmate say Chamberlain "'passed out.'" Aguilar threw water on Chamberlain to wake him up and beat him more. Palacios saw Villafana make multiple trips between working out in E cube and going into D cube.

10

Robert Mayfield witnessed four waves totaling at least 12 inmates assault Chamberlain; the first few waves each lasted a couple minutes but the last wave lasted a "ridiculous" amount of time. The first wave was the Woods. Aguilar struck downward with his fists and used the bunk for leverage as he stomped up and down on something behind a short wall. Aguilar and other inmates put rubber-soled jail shoes over their hands before hitting Chamberlain. Carlstrom held onto the bunk while he violently jumped up and down on something behind the wall. The second wave included Villafana and two South-Siders. Villafana threw two punches with a closed fist. Aguilar, and another inmate Carlstrom handed water to, threw water on Chamberlain to wake him up.

Corral, who was still in D cube, saw inmates hit Chamberlain, spill hot coffee on him, urinate on him, and insert a spoon in his rectum. He saw Villafana hitting and kicking Chamberlain on his head and torso. He also saw Aguilar hitting, kicking, and stomping Chamberlain. After Corral left D cube, he saw Aguilar repeatedly exit D cube, speak with Petrovich, and return to D cube. Aguilar took Chamberlain's clothes outside of D cube when the assault ended.

Richard Reilly was upstairs and saw Carlstrom forcefully kick Chamberlain at least once. He also saw Aguilar kick Chamberlain. Another inmate looked at Reilly and told him to mind his own business and keep moving. When he returned to his cube upstairs, he noticed inmates wetting their shoes. They attempted to get his shoes wet as well.

Jeffery Hurley sat at a table outside B cube and could hear the assault on Chamberlain. Hurley saw Aguilar walk out of D cube, shake hands with Christopher Teague, another Woods torpedo, and wince. Teague said, "'That's why I try to use my feet instead of my hands.'"

11

*E. Aftermath*

Chapluk returned to the guard station about 6:30 p.m. Chapluk faced east while he completed paperwork, and Le faced the computer. Taylor sat in a chair facing west and facing the television. Taylor's view of F West's first floor was obstructed.

Aguilar stood on a table and waved a white cloth to get the deputies' attention. Le stated there was an inmate in F West trying to get their attention. That was the first time a deputy entered F West since about 2:00 or 2:30 p.m. Taylor and Chapluk entered the barracks and asked what the problem was. Pursuant to standard procedure, Le used a video camera to record F West until the tape ended and he recorded over it.

Aguilar told deputies there was a man down in D cube and said, "'he told us his charges and it got out of hand.'" Taylor and Chapluk entered D cube and saw an unconscious Chamberlain dressed only in his boxers with his back to the wall; he did not appear to be breathing or to have a pulse. Chamberlain was soaking wet, and there was water everywhere. Deputies called for medical assistance. Taylor ordered the inmates to return to their bunks, and ordered D cube inmates to sit at the day room tables. Deputies pulled Chamberlain away from the wall, removed food to clear his airway, and began cardiopulmonary resuscitation (CPR). Additional deputies arrived with an artificial manual breathing unit and defibrillator. Deputies pulled Chamberlain out of the water, used the defibrillator, and performed CPR until the paramedics arrived. When the paramedics took over, Chamberlain had no heart rate. Chamberlain was transported to the hospital where he was eventually pronounced dead at 7:33 p.m.

*F. Investigation*

Investigators interviewed all 146 F West inmates that evening and the following morning, and some multiple times over the following weeks and months. Investigators interviewed 30 or more additional people, including over 20 OCSD personnel.

*1. October 5, 2006*

Immediately after the assault, Deputy Michael Lacey noticed Aguilar's pants and shoes were wet. Aguilar said he was in the shower getting water to revive Chamberlain. Aguilar's hands did not appear to be red or swollen. Later, Chamberlain's blood was found on the side of Aguilar's left shoe. Lacey found a pair of wet shoes in B cube under bunk 12. Carlstrom admitted they were his shoes.

Later that night, investigators interviewed Carlstrom, who said he did not know much. Carlstrom said he was playing dominoes when he heard a commotion, went to D cube, and saw Chamberlain laying on the ground bleeding. He thought someone was being taxed. A group of people were standing around him yelling profanity and "'baby raper.'" Carlstrom went back to playing dominoes. He estimated the assault lasted "a good 15 minutes." He did not see anyone hit Chamberlain and denied any involvement. Carlstrom said Chamberlain was a loner, and he did not know his charges.

*2. October 6, 2006*

The next day, deputies moved Petrovich to Module L. Deputy Brett Darnell saw Petrovich communicating with an inmate and turned on the intercom to listen to their conversation. Petrovich told the inmate he was in F Barracks and "'some guy got killed over there yesterday for being a child molester.'" The inmate asked Petrovich if he was involved and he replied, "'Yeah.'"

Investigators interviewed inmate Jerry Ibarra. Ibarra stated he was playing cards when he saw people running into D cube and heard cheering "when they ma[d]e a hit," but he did not intervene because he was scheduled to be released. He heard there was "a man down" and walked to D cube, but he could not see anything. Someone asked him if he was a doctor because he had previously provided first aid to another inmate. He did not see anyone being assaulted.

Investigators interviewed inmate Robert Mayfield, who reviewed photographs of all 145 inmates. He identified 10 inmates as being involved in the attack

on Chamberlain, including Carlstrom (grabbed the bunk and jumped up and down), Aguilar (repeatedly kicked and punched Chamberlain), and Daniel Costa (violently kicked Chamberlain three times field goal style).

Investigators interviewed Villafana. Villafana stated he was in the showers for 20 to 30 minutes and did not see anything. Villafana later testified at the Grand Jury he was working out in H cube with Michael Ayala.

Investigators also interviewed Guillen, who denied any knowledge of the incident or who was involved. Guillen said he was playing cards during the assault. He saw many people going in and out of D cube and heard noises, but he tried to stay away. He did not have any problems with Chamberlain and did not know who would want to hurt him. Chamberlain's blood was found on Guillen's left shoe. Guillen was released from custody in December 2006 and was deported to Mexico.

Investigators interviewed Carlstrom again and advised him of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). After repeating his story he was playing dominoes, Carlstrom claimed he was the house mouse and asked Chamberlain for his paperwork when he first arrived but he did not have it. Carlstrom also stated Petrovich was the Woods "rep" and would have given the "green light" to tax Chamberlain, but he did not see Petrovich hit or kick Chamberlain. He stated, "Everybody had a chance to have a turn" hitting and kicking Chamberlain. Carlstrom admitted he kicked a hunched over Chamberlain once in the back or butt sending him towards the wall. He admitted that when he kicked Chamberlain, "He was pretty messed up." Carlstrom denied he hit Chamberlain.

After investigators advised Aguilar of his *Miranda* rights, they interviewed him. Aguilar told investigators that he was in J cube when he overheard Chamberlain tell an inmate that he was in custody because of a restraining order. Aguilar went to I cube and heard rumors Chamberlain liked young girls. He went to L cube and heard a White guy and three Mexicans discuss how Chamberlain was going to be "put . . . on the wall"

14

and taxed.  Aguilar went downstairs and saw inmates gathering.  After he went to the downstairs shower and started to undress, two Mexicans entered and told him Chamberlain was in bad shape.  After Aguilar told a group of inmates who were standing in front of D cube to "'fan it out,'" Aguilar went into D cube and saw Chamberlain slumped against the wall.  He ran to the showers, got two cups of water, returned to D cube, and splashed water on Chamberlain to revive him.  Aguilar got on the table and waved to alert the deputies.  He denied hitting or kicking Chamberlain.

Later that day, Aguilar, Carlstrom, and Michael Garten were moved to P Module where they were housed in single person cells.  Inmates communicated with each other during day room time and via "kites," written communications.  Sean Pough was also housed in P Module.  Pough had numerous conversations with Garten and received kites from him.  He also spoke with Aguilar many times.  On multiple occasions, Aguilar told Pough that he was concerned about the fact he inserted a pencil into Chamberlain's rectum.  Pough asked Aguilar why he was worried about that when Chamberlain was dead, and Aguilar repeated his concern.

Finally, investigators interviewed Petrovich after advising him of his *Miranda* rights.  Petrovich admitted "[he] was the mouthpiece for the whites[]" and held the "keys."  Petrovich told investigators that earlier in the day deputies had requested to speak with the Woods rep and pulled him out of the barracks.  Deputies asked Petrovich if he "'sp[oke] English'" and "'c[ould] hear.'"  Deputies discussed the fact there was a child molester in J cube, bunk 7.  Petrovich said the South-Siders run F Barracks so he told the South-Siders that Chamberlain was a child molester and to "do whatever."  When an investigator stated, "You kind of lit the fuse by telling the 'South-Siders' what you heard," Petrovich, answered "Right" and "You're right."  He knew Chamberlain would be taxed.  After chow, Petrovich approached Chamberlain in J cube and asked him about his charges.  Chamberlain said he was going back to court and then Arizona.  Petrovich met with the Mexicans in L cube, and they decided Chamberlain would go to "the wall";

15

two inmates would take body shots for 16 seconds.  Petrovich played cards and never heard Chamberlain.  Twenty minutes later, Aguilar yelled "man down."  Petrovich said he was never in D cube and did not touch Chamberlain.  He said about 50 inmates hit Chamberlain for about 20 minutes and admitted, "It got out of hand."

*3.  October 17, 2006*

Investigators interviewed Petrovich again.  Investigators played the interviews of Aguilar, Carlstrom, and Garten for him.  Petrovich again told investigators that deputies had a conversation in his presence about Chamberlain.  Deputies said to keep it discreet and as long as inmates "ke[pt] it under [Chamberlain's] clothes," deputies would not get involved.  Petrovich said Taylor looked at him and said, "'You understand?'"  Petrovich winked.  Taylor offered an incentive of an extra hour of day room time.  Petrovich repeated the South-Siders run the barracks and he had to get their permission before taxing anyone.  Petrovich went to N cube and spoke with the South-Siders "Stretch" and relayed what Taylor told him.  All the other inmates were "racked-up" on their bunks, but Petrovich had special privileges because of his status in the CAR.  He went to J cube and asked Chamberlain about his charges, and he said he was going to Arizona.  Petrovich explained child molesters, rats, and thieves are the three worst groups of inmates and there are no rules on taxing.  Usually, Petrovich would act as a referee and count, but he did not need to arrange anything and he did not want to get involved so he played cards.  Petrovich looked into D cube and saw five or six Mexicans and White "dudes."  Chamberlain was lying on his side against the wall breathing weird with his boxers hanging off.  Petrovich told everyone to stop and "put the red light" on the Whites.  He then signaled to Stretch that it needed to stop and continued playing cards.  Petrovich said the taxing got out of hand because it was "poorly orchestrated."  Aguilar got on the table to get the deputies' attention.

At some point, investigators questioned Petrovich about Garten's interview.  Garten told investigators he was Petrovich's bunkmate and knew him well.  Garten said

16

Petrovich was in D cube with Ryan Crowley and another inmate when Chamberlain was dragged in. Garten was supposed to be part of the first group to assault Chamberlain. When Garten entered D cube, Petrovich, Crowley, and another inmate got "involved" and got in Garten's way. After investigators played Garten's interview, the following colloquy occurred:

"[OCSD Lead Investigator Ken Hoffman]: Okay. Same two questions. Anything that you've heard with . . . Garten surprise you?

"[Petrovich]: Surprise me, no. What he said was pretty much on the money.

"[Hoffman]: Hang -- hang on.

"[Petrovich]: Yeah.

"[Hoffman]: I just wanna [*sic*] write this down.

"[Petrovich]: Yeah, he was -- he -- he got everything right --

"[Hoffman]: -- a hundred percent?

"[Petrovich]: Right on the money. I couldn't -- yeah, right on the money. Yeah, a hundred percent."

*4. December 26, 2007*

Investigators interviewed Guillen while he was in custody at the City of Anaheim jail after advising him of his *Miranda* rights. Guillen said he was the Paisanos mouse. Guillen was playing cards when he saw them coming downstairs and asked what was happening. They said they were going to tax Chamberlain. Guillen was told Chamberlain had raped or molested an eight-year-old girl and all Mexicans had to participate in his taxing. Guillen said he kicked Chamberlain once in the legs with his right foot. He then removed his shoe and hit him three times on the stomach with his shoe. Chamberlain was on his side, moving and screaming when Guillen hit him. Guillen said at least 30 inmates assaulted Chamberlain for about 15 minutes. Guillen explained he has daughters and thought about if they were molested. Guillen said he was

17

afraid he would be taxed if he did not participate, he knew what he did was wrong, and it is difficult to understand if you are not in that position. But he also admitted he had a choice whether to participate and he participated because he wanted to hit Chamberlain. Guillen agreed taxing is a common occurrence in jail and it usually consists of "about 30 seconds, 30 blows on the body." He said generally each race taxes their own race but with child molesters everyone participates in the taxing.

5. *Sometime in 2008*

Orange County Weekly reporter Nick Schou interviewed Petrovich in early 2008. Schou reported the following:

"'Petrovich knew Chamberlain was being beaten up because Petrovich had told the inmates now attacking Chamberlain that [he] was a "Chester."

"'Petrovich told Schou that he did not touch Chamberlain himself, but he acknowledged, "[he] lit the fire."

"'Petrovich did not dispute that he spread the word of Chamberlain's status as a sex offender to the inmates who carried out the attack against Chamberlain.' [¶] . . . [¶]

"'Petrovich said that earlier in the day, prior to the beating of Chamberlain, an inmate approached him to say that the deputies wanted to talk to the White shot-caller. Petrovich told . . . Schou that he told the inmate, "no," but that the second time the inmate told Petrovich that the deputies wanted to talk to him as the White shot-caller Petrovich said, "Okay." Petrovich told Schou that he walked over to the locked door leading to the hallway, and after being buzzed through by the guard tower, he saw . . . Taylor and . . . Chapluk standing [in] the doorway. After the door locked behind him, Petrovich said that . . . Chapluk asked him if he spoke English. Petrovich said that when he said, "Yes," the two deputies carried out a brief conversation they clearly intended him to overhear. "There is a child molester in J7." Petrovich said that . . . Taylor remarked to . . . Chapluk, "and you know what happens when there's a child molester." Petrovich told Schou that

18

. . . Taylor didn't mention Chamberlain by name, but then instructed Petrovich to ensure that the inmate in J7 was beaten up at 8:00 p.m. That evening after dinner when [*sic*] the inmates would be rewarded with an extra dayroom period. Petrovich also told Schou, "they wanted us to beat this dude up." Referring to . . . Taylor, Petrovich told Schou, "he gave us an incentive. He didn't say we had to do it." Petrovich told Schou that . . . Taylor told him that Chamberlain had to survive the assault without any obvious facial injuries. He said, "Don't hit him from the neck up. Just the neck down. Make sure he can walk out of here and I said, okay."

"'Petrovich told Schou that at that point, . . . Taylor and Chapluk allowed him back into the barracks, and he, Petrovich, went to J cube and saw Chamberlain sitting on his bunk and asked him why he was in jail and, "he, Chamberlain, said, some story about some freaking warrant. I don't remember. An out-of-state warrant. Something petty." Petrovich told Schou that Chamberlain didn't seem particularly nervous and that Petrovich said to him, "All right. See ya," and walked away. Petrovich told Schou that Chamberlain, "was a creepy looking dude. He looked weird. All those perverts look the same. He was like a little pig. Fat and little. I don't know what was up with that dude."

"'Petrovich told Schou that he left J cube and approached the shot-caller for the South-Siders[,] [a] Latino inmate whose nickname was "Stretch" because, Petrovich explained to Schou, while only White inmates can beat up another White inmate, that rule doesn't apply to "child molesters or weirdoes. They're wide open." Petrovich told Schou that telling the South-Siders about the upcoming beating was also a matter of respect since, "when you are going to beat someone up, you have to tell them so they don't start tripping." Petrovich told Schou that Stretch replied, "All right, thanks for letting me know."

"'Petrovich told Schou that he next went to his bunk in L cube. "I tell everyone in my cube that this guy, Chamberlain, is a child molester." Petrovich then told Schou that, "everyone just started getting pumped up. Let's get him. People were like,

19

let's do this.  Let's not wait until 8.  Next thing I know the dayroom opens.  I'm playing cards and I see Chamberlain walk down to D cube and he walks in and that's when it happens."  Petrovich didn't want to tell who escorted Chamberlain to D cube and he told Schou, "I don't want to point fingers at anyone."

"'Petrovich told Schou that he sat at a metal table playing pinochle while the White inmates beat Chamberlain.  Petrovich said, "An inmate comes up to me and says, "we got a man down.  Come check this out."  Petrovich told Schou, "So I go into the cube and see Chamberlain on the floor.  He was lying on the ground holding his sides not talking.  He was moaning."  Petrovich told Schou that he told the inmates to stop the attack.  "I said that's it.  No more.  It's over."  Petrovich insisted to Schou that Chamberlain was still breathing.  "I walk out of the cube and I see 50 Mexicans running in there.  I said, "Stop," but they kept on coming."  Petrovich told Schou that the White inmates scattered, and he, Petrovich, returned to his card game while the Latino inmates took their turn with Chamberlain.  Petrovich told Schou that Chamberlain was yelling for his life.  "Please help me.  Stop."  I could hear it from the card table maybe 30 feet away."  Petrovich told Schou, "It was a whole herd of people.  The Mexicans went in there, and who knows what they did.  People were coming and going.  They were getting him to confess.  Someone was yelling at him what he was, and finally he admitted he was a child molester.  That's what I heard later.  I heard they stuck a tube of toothpaste up his ass."

"'Petrovich told Schou that he recalls being amazed that the deputies didn't notice all the commotion.  "You've got 200 people in the barracks.  Every single person was looking at D cube.  You got 50 people in one cube for 20 minutes.  What are you dudes at - - where are you dudes at," referring to the guards.

"'Petrovich told Schou, smiling nervously at his feet, "It's crazy.  Fuck.  I'm being charged with murder for no fucking reason, honestly.  I think it should be manslaughter.  There was no intent to kill him.  I never told the White dudes, "Go kill

20

this guy." I said, he's a child molester. But I didn't touch him. If Taylor isn't being charged, why am I? Just because he's wearing a badge doesn't make him above the law, and just because I'm an inmate doesn't make me automatically guilty. I don't want them to charge him with murder. I just want to get in the same boat as him.'""

*6. Sometime in 2010*

A television reporter interviewed Carlstrom sometime in 2010. Carlstrom said he was scheduled to be released two months after the assault and he would not have "touched that guy" if he was not obligated to. Carlstrom analogized the sound of the assault to a Public Broadcasting Service documentary where "wolf pack brings down an elk or a deer, you know how they work together on bringing that animal down, that's what I felt. It felt just like death." Carlstrom claimed he tried to drag Chamberlain out of D cube but "they said no, he's not going anywhere."

*7. September 9, 2011*

Investigators interviewed Ibarra again. Ibarra stated he was playing cards with Petrovich. Ibarra explained he worked in a funeral home for many years and knew CPR so when he provided first aid for an inmate, other inmates believed he had medical training. Ibarra saw Taylor pick up Chamberlain, toss him, and slap him to wake him up.

*G. Chamberlain's Cause of Death*

Chamberlain's cause of death was multiple severe blunt impacts leading to failed chest mechanism, asphyxia, and cardiac arrest. Every region of Chamberlain's body had blunt force trauma injuries except part of his abdomen. The injuries were very vivid on his face and scalp. Chamberlain's entire back was hemorrhagic. The front of his torso was also hemorrhagic but concentrated in a few areas. Chamberlain had a total of 43 rib fractures and most of his ribs were severely misplaced; 21 of his 24 ribs were broken. His lung was punctured and he had defensive injuries to his upper extremities. He also had three injuries to his anus and rectum that were consistent with penetration by a long slender instrument with a tip or a point such as a spoon, pencil, or toothpaste tube.

21

Chamberlain's injuries could be equated with injuries suffered from a high-velocity car accident or a fall from multiple stories. Except for one rib fracture that caused a long laceration, no single injury was fatal. Chamberlain would not have died without the head and rib injuries.

## II. Procedural Facts

### A. Charging Documents & Grand Jury Proceedings

On November 17, 2006, a felony complaint charged Aguilar, Carlstrom, Garten, Eric Charles Miller, Petrovich, and Christopher Teague with murder (Pen. Code, § 187, subd. (a); all further statutory references are to the Penal Code, unless otherwise indicated). About 10 months later, an information charged them with the same offense.

Meanwhile from May 2007 to February 2008, the Grand Jury investigated a broad range of issues surrounding Chamberlain's death. The DA Report was published in April 2008.

In early 2008, an indictment charged Villafana, Guillen, and Jeremy Dezso Culmann with murder (§ 187, subd. (a)). On July 31, 2009, an amended indictment charged Villafana, Guillen, and Culmann with the same offense. The amended indictment alleged Guillen suffered two prior strike convictions (§§ 667, subds. (d) & (e)(2)(A), 1170.12, subds. (b) & (c)(2)(A)), and a serious felony conviction (§ 667, subd. (a)(1)).

On January 11, 2011, a consolidated and amended information charged Villafana, Guillen, Culmann, Aguilar, Carlstrom, Garten, Miller, Petrovich, and Teague with murder (§ 187, subd. (a)). It also charged Guillen, Culmann, Garten, Miller, and Teague with voluntary manslaughter (§ 192, subd. (a)), which was later dismissed on the prosecution's motion. It alleged the same prior conviction allegations against Guillen.

### B. Pretrial Motions

Defendants filed numerous pretrial motions. We discuss only those relevant to the issues on appeal.

22

*1. Outrageous Government Conduct*

Before the prosecution filed the consolidated and amended information, Garten filed a motion to dismiss for discriminatory enforcement and vindictive prosecution pursuant to *Murgia v. Municipal Court* (1975) 15 Cal.3d 286 (*Murgia*). All the defendants joined Garten's motion. The prosecution opposed the motion, and Garten replied.

A few months later, Garten filed a motion to dismiss for outrageous government conduct in violation of the Fourteenth Amendment and incorporated by reference his *Murgia* motion. Garten also moved to dismiss pursuant to section 1385. Petrovich and Guillen joined Garten's motion.

Defendants argued the government violated their due process rights based on the following: (1) Taylor and Chapluk "'green-lighted'" the assault on Chamberlain, and OCSD prevented "a full, independent, and impartial criminal investigation"; (2) OCSD had an inherent conflict of interest in investigating itself, and OCDA erred in failing to refer the matter to the California Attorney General; (3) OCSD "conspired to testify falsely, to withhold evidence, and to present doctored 'evidence' to the Grand Jury"; and (4) the OCDA "acquiesced, approved, and tacitly joined" in OCSD's "unlawful conduct when it failed to" prosecute OCSD employees who failed to perform their duties and violated Grand Jury rules. Garten's motion included as exhibit A, the DA Report, and it relied on Grand Jury testimony.

As to the circumstances of Chamberlain's death, the overarching theme of defendants' motion was that deputies were derelict in their duties. Although deputies are to perform floor checks every 30 minutes, no deputy had been on the F Barracks floor from 2:00 p.m. until they were notified an inmate was injured at 6:50 p.m. "[D]eputies do not actively participate in supervising inmates" but instead "remain in the guard station" and watch television, play video games, browse the Internet, talk online, and sleep with the lights off. Deputies would go as long as 30 minutes without looking out

23

the guard station windows.  Defendants stated, "OCSD deputies routinely used inmates called 'shot callers' to enforce discipline or inflict punishment on other prisoners[]" in violation of OCSD policy and section 4019.5.  Deputies rewarded shot callers who obeyed and threatened those who did not.  They stated Taylor had been the subject of previous complaints concerning unauthorized discipline and punishment, including the use of a "'pepper-ball' rifle."  They detailed Petrovich's numerous statements to investigators and a reporter that Taylor authorized the assault.  They also cited statements from other inmates not charged in the crime establishing Taylor met with Petrovich, uncharacteristically opened day room early, and after the assault said, "'You guys fucked up.  I didn't tell you to do it that way, somebody is going to be in trouble for this[,]' and 'Fuck, you guys weren't suppose to take it this far.'"  Defendants claimed Taylor had previously authorized an assault on another inmate.

With respect to the investigation of Chamberlain's death, defendants stated that in 1985 pursuant to an Orange County Board of Supervisors' resolution, the OCSD and OCDA "adopted . . . written procedures" whereby "the OCDA assume[d] the primary investigative responsibility" into the death of any OCSD inmate "to eliminate any perceived conflict of interest."  (Fn. omitted.)  OCSD's policies provide it will participate in the investigation "'*as requested* by the [OCDA].'"  (Fn. omitted.)  Since 1985, the OCDA has investigated 129 of the 130 deaths that occurred in OCSD's custody.  "'The only deviation in the more than 20 year history of this protocol occurred . . . in the [OCSD's] handling on . . . Chamberlain's murder investigation.'"  (Fn. omitted.)  Defendants then discussed in detail OCSD's claim it had always investigated homicides in custodial death situations.  They painted a tangled web of OCSD's perjured testimony, "doctored" reports, and general malfeasance in their attempt to rebut the OCDA's claim it was the lead investigative agency in all OCSD custodial deaths.  Defendants alleged OCSD called the OCDA about 8:00 p.m., and made clear it was the lead investigating agency.  OCSD requested OCDA send three or four investigators to "'monitor' or

24

'shadow'" OCSD investigators. They also stated OCSD did not comply with Grand Jury subpoenas. First, OCSD did not produce Taylor's file because it was "lost" and it was the only file ever known to be missing. Second, OCSD produced the F Barracks log book but "the 'shot caller' log was missing." (Fn. omitted.) Defendants said OCSD deputies violated Grand Jury secrecy rules and testified falsely. Between 5:50 p.m. and 6:50 p.m. on the day of Chamberlain's death, Taylor sent or received a total of 22 text messages to his girlfriend and two female deputies. Both of the female deputies revealed to Taylor the contents of their testimony and the Grand Jury's evidence.

Defendants argued OCSD failed to comply with its protocol with OCDA and improperly investigated itself. They also contended OCDA improperly failed to refer the matter to the California Attorney General, who has direct supervisory powers over all district attorneys and sheriffs. (Cal. Const., art. V, § 13; Gov. Code, §§ 12550, 12560.) They also alleged OCDA improperly failed to prosecute the deputies involved in the assault or OCSD employees who obstructed the investigation. Defendants concluded the outrageous government conduct violated their federal and state constitutional rights and requested the trial court to dismiss the case.

The prosecution opposed defendants' motion to dismiss for outrageous government conduct. After discussing and distinguishing the legal authority defendants relied on, the prosecution argued the conduct in this case did not involve physical or mental abuse directed at defendants, or interfere with their right to counsel. The prosecution asserted OCDA "aggressively investigated both the homicide and conditions more generally at [TLJ], and issued a scathing report." The prosecution added, "There is nothing to suggest that the [OCDA] interfered with the [G]rand [J]ury's independence in this investigation or that the intervention of the Attorney General was required in order for there to be an independent investigation."

At a hearing in July 2010, the trial court denied Garten's motion to dismiss for discriminatory enforcement and vindictive prosecution.

25

Four months later, the trial court conducted a hearing on defendants' motion to dismiss for outrageous government conduct. The court indicated it had read and considered the moving papers, including the DA Report. After Garten's counsel detailed what he considered to be the 10 most egregious facts discussed in the DA Report, counsel argued defendants could not get a fair trial because OCSD investigated itself during the most important part of the investigation, the first 72 hours, and there is no way to know how the investigation would have turned out had OCDA lead the investigation from the start. Relying on the fact OCSD investigated itself, Petrovich's counsel analogized the prosecution and trial of the defendants to a "home . . . built on a faulty foundation."

The prosecutor responded there was no legal authority supporting defendants' claim the court should "do the most extreme of actions and throw out this criminal prosecution." The prosecutor added Garten's motion was "a rehashing of" Garten's motion to dismiss for discriminatory enforcement and vindictive prosecution. The prosecutor argued defendants failed to establish both that the government violated an independent protected right, and that the government conduct "was so outrageous, so egregious, so repugnant that it shocks the conscience, that it violates the canons of decency." The prosecutor stated defendants asserted three arguments: OCDA should have charged other people, OCDA should have called the California Attorney General, and OCSD should not have conducted the initial investigation. The prosecutor asserted none of those were independent protected rights. Garten's counsel replied a fair trial requires a fair investigation. Guillen's counsel stated the defendants' independent protected right was to be secure in the deputies' custody.

The trial court denied defendants' motion to dismiss for outrageous government conduct. The court began by stating the claim it is impossible to know what would have happened had OCDA been the primary investigating agency was entirely speculative and unpersuasive and did not amount to outrageous government conduct.

26

The court stated: "There [are] no grounds for an outrageous governmental conduct motion in this case. The defendants can get a fair trial in this case, and I don't think the investigation conducted the way it was amounts to the threat of a violation of due process; that is, the threat that a fair trial be denied. Therefore, . . . the outrageous governmental conduct motion is denied . . . . There is no law to support the grant of an outrageous governmental conduct motion in the context of this case, and I mean by that very specifically that the defendants can receive a fair trial in this case; and, therefore, I do not see a denial of due process."

2. *Jury's View of F Barracks*

After the prosecution filed the consolidated and amended information, Guillen filed a motion to allow the jury to view TLJ pursuant to section 1119. In his motion, Guillen argued the jury's view of F West was appropriate for the following reasons: (1) conditions inside a jail were not a matter of common knowledge and it was likely the jury would rely on inaccurate mental image of what F West looked and sounded like; (2) an accurate representation of F West could not be duplicated because photographs and diagrams could not precisely portray distances and acoustics; (3) a view of F West would among other things enable the jury to ascertain sight lines, gain a perspective of F West's audio and visual characteristics, and improve their ability to test the veracity of the witnesses; and (4) a view of F West could be easily and quickly accomplished because of its close proximity. All defendants joined in Guillen's motion.

The prosecution opposed Guillen's motion to view TLJ. In its opposition, the prosecutor argued a jury view of F West was inappropriate for the following reasons: (1) since Chamberlain's death, the conditions of F West had materially changed, including the removal of the privacy walls in each cube and installation of 22 cameras and multiple large screen monitors in the guard station; (2) there were adequate and ample alternatives to a jury view of F West, including hundreds of photographs and

27

numerous diagrams illustrating F West's configuration; and (3) a jury view of F West was not easy or quick and would necessitate the planning and moving of 145 inmates.

At a hearing on defendants' motion to view F West, the trial court indicated it had read and considered the written submissions and heard argument, which included a discussion about the fact defense counsel had previously viewed F West and it was a "breathtaking experience" that photographs could not convey. Relying on section 1119, the court stated it was "afraid of a jury view in this case" and explained the jury would be mislead by a view of F West because of the material changes to its layout and the inability to recreate the audible circumstances of the case. The court opined that because the conditions of F West had changed, the privacy walls were removed and the blind spot in D cube was gone, the probative value of viewing it are diminished. The court stated the photographs were the closest representation of F West's layout at the time of the incident. The court repeated it would be difficult to recreate the noise level and placement of the inmates. The court was also concerned with the logistical issues of a jury view and the emotional impact on the jury. The trial court denied defendants' motion to view F West.

3. *Prosecution's Evidence Code Section 402 Motion*

The prosecution filed an Evidence Code section 402 motion, which included 15 issues, two of which are relevant on appeal.

First, the prosecution sought to admit Chamberlain's statements to Palacios and Chapluk. The prosecution stated Palacios asked Chamberlain why he was in custody, and Chamberlain said he violated a restraining order. The prosecution also stated that after receiving information from Chamberlain's attorney, Chapluk spoke with Chamberlain, and Chamberlain told him that inmates had "pressured" him about his charges, and he did not feel he was in any danger, but he might need to be moved before his next court date. The prosecution sought to admit the statements not for the truth of

28

the matter asserted but under Evidence Code section 1250 to demonstrate Chamberlain's state of mind he feared inmates.

Second, the prosecution sought to exclude the following extrinsic facts discovered during the Grand Jury investigation: (1) "character evidence of [OCSD] personnel," including OCSD policy violations and past conduct, OCSD personnel conduct before the Grand Jury, and OCSD personnel discipline and termination; (2) "evidence of inter-agency investigative policy and practice for custodial deaths"; and (3) evidence of reports of the Grand Jury, OCDA, and Office of Independent Review (OIR). (Original capitalization omitted.) The prosecution argued the Grand Jury ultimately investigated matters that were not directly relevant to Chamberlain's killing and "[a] clear division must be drawn" between the broad Grand Jury investigation and the issues in defendants' trial. The prosecution placed the onus on the defense to identify the evidence discovered during the Grand Jury proceedings that was potentially relevant at trial and to establish its admissibility.

With regard to the first category of evidence, the prosecution alleged the Grand Jury received evidence concerning a broad range of OCSD personnel policy violations, including the following: "sleeping on duty; improperly watching television, playing video games, and browsing the Internet; failing to conduct timely floor patrols; failing to maintain adequate records; using unauthorized forms of discipline; denying inmate requests for medical services; inappropriate uses of a 'pepper-ball' gun; and inappropriate reliance on inmates to enforce rules." The prosecution claimed this past conduct was irrelevant to their guilt, was improper character evidence, and its admission would necessitate an undue consumption of time. The prosecution explained OCSD personnel conduct before the Grand Jury, including their response to Grand Jury requests, violations of secrecy, and untruthful testimony, was irrelevant, improper character evidence, hearsay, and its admission would necessitate an undue consumption of time.

29

Last, the prosecution asserted whether any OCSD personnel were disciplined or terminated was irrelevant to their guilt.

As to the second category of evidence, the prosecution contended evidence of OCSD and OCDA protocols for investigating inmate deaths was irrelevant, and its admission would confuse the jury and necessitate a substantial consumption of time. As an aside, the prosecution stated that although the Grand Jury ultimately concluded OCSD violated protocol when it lead the investigation into Chamberlain's death, the prosecution opined the protocol was nonbinding and ambiguous, and OCSD possessed the authority to lead the investigation. Finally, with respect to the last category of evidence, the prosecution contended Grand Jury, OCDA, and OIR reports were irrelevant, and included inadmissible hearsay, opinion, conclusions, and speculation.

Carlstrom opposed the prosecution's Evidence Code section 402 motion. All defendants joined in the opposition. Carlstrom submitted on the issue of the admissibility of Chamberlain's statements to Palacios. However, Carlstrom objected to admission of Chamberlain's statements to Chapluk. Carlstrom argued Chamberlain's statements to Chapluk were not relevant to any issue at trial. He also claimed admission of the statement violated *Crawford v. Washington* (2004) 541 U.S. 36. Finally, he claimed Chapluk's testimony concerning what Chamberlain said was untrustworthy because Chapluk had a motive, criminal and civil liability, to lie.

Later that day, the trial court heard argument on the prosecution's Evidence Code section 402 motion to admit Chamberlain's statements to Palacios and Chapluk. After the prosecutor agreed with the trial court's lengthy explanation concerning the prosecutor's proffer, Carlstrom's defense counsel objected, on among other things, relevancy grounds. The court inquired why the statements were relevant. The prosecutor argued the statements were relevant because "it's state of mind that it's consistent with his subsequent conduct." The court asked how Chamberlain's state of mind was at issue in this case. The prosecutor argued Chamberlain's state of mind was at

30

issue because it rebuts the defenses' assertion Taylor orchestrated the assault. The court again asked how Chamberlain's statements rebut the defenses' theory Taylor instigated the assault. The prosecutor explained Chamberlain's statements tend to establish he was afraid of the inmates and not Taylor. Carlstrom's counsel again objected on relevancy grounds. When Guillen's defense counsel asked how Chamberlain's state of mind was at issue, the court asked the prosecutor to explain its relevance again. The prosecutor explained Chamberlain's statement to Palacios he was in custody for violating a restraining order explains his subsequent conduct of telling Taylor and Chapluk that he was comfortable staying in F Barracks until his next court date. Petrovich's counsel asserted he did not "believe that's a state of mind," and the court asked the prosecutor to "flesh it out totally and completely so everybody is online."

The prosecutor repeated the theory, and Guillen's defense counsel asked why it was relevant at this stage of the proceeding. The court mused it would become an issue because the jury would have to decide whether the inmates committed the assault without input from deputies, or did a deputy authorize the assault. Guillen's defense counsel asked how Chamberlain's statement he was not afraid of inmates is relevant to whether Taylor "started a series of dominoes falling." After a short recess, the court indicated it could not view the statements in isolation but it had to consider "the entire conversation." The court discussed the timing of the statements and indicated Chamberlain's statements in their entirety do not "necessarily negate Taylor greenlighting [*sic*], but an interpretation could be made that it does tend to negate that." The court concluded the entire conversation tended to "cast light on an issue in the case" but the court took the matter under submission.

The following week, at a hearing on the prosecution's Evidence Code section 402 motion concerning the exclusion of extrinsic facts from the Grand Jury investigation, the trial court explained it had read and considered the prosecution's motion. Carlstrom's defense counsel objected to a pretrial determination whether each

31

category of evidence was admissible. When the court inquired of Guillen's defense counsel whether the prosecution's motion should be litigated pretrial, Guillen's counsel stated the court and counsel could identify broadly what evidence could be admissible and what evidence was likely to be excluded. Guillen's counsel identified the following categories of evidence as having "more relevan[ce], at least on the surface immediately[:]" deputies delegated authority to inmates to enforce TLJ rules; "greenlighting" [*sic*]; taxing; and OCSD and OCDA protocol concerning investigation of inmate deaths. When Petrovich's defense counsel interjected he thought they were discussing the procedural issue of when the motion should be litigated, Guillen's counsel stated he was identifying areas that were on the surface relevant and that could be litigated pretrial. Later that day, after hearing from all defense counsel on the proper procedure, the trial court issued a tentative ruling on the categories of evidence the prosecutor sought to admit.

The trial court explained evidence of Taylor, Chapluk, or Le violating OCSD policies could be relevant. The court added though, "My feeling is that the farther we get away from . . . Taylor, . . . Chapluk, and . . . Le into other deputies on other occasions who may have engaged in this conduct, the more remote the evidence becomes." The other deputies' violation of policy was irrelevant, remote, and its admission would necessitate an undue consumption of time and mislead the jury. The court opined evidence a witness who testified at trial committed perjury before the Grand Jury could be admissible to impeach that witness. The court added evidence of OCSD and OCDA protocol regarding which was the lead investigating agency of an inmate death was irrelevant. The court explained evidence of OCSD conduct before the Grand Jury was irrelevant and excluded under Evidence Code section 352. The court also explained evidence of OCSD personnel discipline and termination was irrelevant and excluded under Evidence Code section 352. Finally, the court opined evidence of Grand Jury, OCSD, and OIR reports was irrelevant and excluded under Evidence Code section

32

352. Petrovich's counsel objected that use of force by deputies other than Taylor, Chapluk, and Le could instill a sense of fear in inmates and that evidence could be admissible at trial. The court repeated the more remote the evidence is from Taylor, Chapluk, and Le, the less relevant it became, but the court would make that determination as needed.

At a pretrial hearing a couple weeks later, the trial court revisited the issue of the admissibility of Chamberlain's statements to Palacios and Chapluk and ruled the statements were admissible because they were relevant to Chamberlain's state of mind. The court ruled Chamberlain's statement to Palacios was admissible because it was nonhearsay, the prosecutor was not offering Palacios' statements for the truth of the matter asserted, it was not testimonial, and it was "clearly relevant." The court ruled Chamberlain's statement to Chapluk was not testimonial, was admissible under Evidence Code section 1250, and was sufficiently trustworthy to be admitted into evidence. The court indicated it would give the jury a limiting instruction.

At a pretrial hearing the following month, the trial court revisited the prosecution's motion to exclude evidence of extrinsic facts from the Grand Jury investigation. The trial court repeated its tentative rulings as to each category of evidence.

*C. Trial*

Trial began on August 8, 2011. Culmann, Garten, Miller, and Teague previously pleaded guilty. Taylor invoked his Fifth Amendment right against self-incrimination.

*1. Prosecution's Evidence*

The above interviews were admitted into evidence. They were admitted via witness testimony, stipulation, read into the record, or played for the jury.

OCSD Deputy Sheriff Kurt Kohler provided some of the evidence detailed above concerning TLJ and the CAR system. On cross-examination, Petrovich's defense

33

counsel asked Kohler whether at the time of the assault deputies routinely used inmate shot callers to enforce discipline or inflict punishment on other inmates. The prosecutor objected on the grounds it was irrelevant, compound, and violated the court's Evidence Code section 402 ruling. The court sustained the prosecutor's objection. The court repeatedly sustained the prosecutor's objections to counsel's questions whether it violated the law to allow one inmate to have power over another inmate.

Chapluk, who was still an Orange County Sheriff Deputy at the time of trial and granted immunity for his testimony, testified concerning F Barracks procedures generally and the events the day of Chamberlain's death. As relevant here, Chapluk testified Taylor told Chamberlain they had received a telephone call from his attorney and asked him if he was in fear for his safety. Chamberlain said inmates were pressuring him to produce his paperwork to show what he was charged with. Taylor asked Chamberlain if he was comfortable staying in F Barracks until his next court date when inmates would expect him to return with his paperwork. Chapluk testified Chamberlain said he was not in any fear until his next court date. Chapluk denied he told any inmate about Chamberlain's charges. He also stated he did not hear Taylor tell any inmate about Chamberlain's charges.

During Carlstrom's defense counsel's cross-examination of Chapluk, the issue arose whether evidence Taylor and Chapluk violated OCSD policies was admissible. After the trial court repeated its pretrial Evidence Code section 402 rulings, Carlstrom's counsel stated he wanted to examine Chapluk about whether he or Taylor denied inmates medical treatment or improperly disciplined inmates, "including the use of a pepper ball gun, tossing bunks," gardening, cleaning the barracks, and loss of day room. The prosecutor argued the evidence was irrelevant, its admission would necessitate an undue consumption of time, and it was inadmissible pursuant to the court's Evidence Code section 402 rulings. The court ruled evidence deputies denied inmates medical treatment was irrelevant and unduly prejudicial, and its admission would confuse

34

the jury and necessitate an undue consumption of time. The court also ruled evidence Taylor, Chapluk, or Le improperly used a pepper ball gun, tossed bunks, or cancelled day room time was admissible. The court concluded evidence deputies made inmates garden or clean F Barracks was irrelevant.

When cross-examination resumed, Chapluk agreed OCSD did not permit deputies to meet with shot callers. Carlstrom's defense counsel then asked Chapluk whether deputies meeting with shot callers violated OCSD policy. The court sustained the prosecutor's objection counsel's question violated the court's pretrial Evidence Code section 402 rulings. Chapluk admitted neither he nor Taylor did floor checks every half hour the day Chamberlain was killed. When counsel asked Chapluk whether Chamberlain would be alive if he had done floor checks every 30 minutes, the court sustained the prosecutor's objection. Chapluk said Taylor was awake but not doing paperwork or moving around. Petrovich's defense counsel asked Chapluk whether through his training he knew the CAR system violated OCSD policy and the Penal Code. The court sustained the prosecutor's objections counsel's question violated the court's pretrial Evidence Code section 402 rulings. Chapluk claimed he was concerned about Chamberlain's safety but admitted that when he returned to the guard station at 6:30 p.m., he did not check on Chamberlain. He also admitted both he and Taylor encouraged inmate behavior that would minimize the writing of reports. Finally, defense counsel thoroughly cross-examined Chapluk about his and Taylor's conversation with Chamberlain.

Ayala, who was housed in Pelican Bay, was found in contempt of court when he repeatedly refused to take an oath and answer questions.

Palacios testified to his observations of the assault as previously described. Palacios admitted he was not truthful during his first interview with investigators because he did not want to get taxed. Palacios explained he met Chamberlain while standing in

line for chow and asked him why he was locked up. Chamberlain stated he violated a restraining order. This was before the day inmates killed Chamberlain. He was 100 percent sure Petrovich, Villafana, Aguilar, and Guillen were involved. When asked on cross-examination, whether he agreed Taylor "ran [F Barracks] like a drill sergeant," Palacios replied, "Yes." Palacios stated he asked Chamberlain his charges as a way of making conversation. He said it was common to ask an inmate his charges when you first met, but he did not ask for his paperwork.

As previously described, Reilly testified to his observations of the assault. Reilly also explained that when he was in F West, inmates asked him to show his paperwork to prove why he was in custody. The prosecutor asked whether that was a common practice, and he answered it was. The trial court sustained Carlstrom's defense counsel's foundational objection, and struck the answer. Reilly explained that during his second interview investigators asked him to select photographs of inmates who were involved in the attack. Reilly admitted he selected photographs of inmates who were not involved because he was scared. Reilly stated he requested a third interview and told the truth. On cross-examination, Reilly admitted he had been taxed within 10 days of Chamberlain's death. Reilly believed the CAR management directed the taxing. On redirect examination, Reilly stated inmates taxed him because he did not bring his paperwork back from court.

Mayfield testified to his observations of the assault as summarized above. On cross-examination, Petrovich's defense counsel elicited testimony from Mayfield that he was not surprised deputies did not respond to Chamberlain sooner because deputies watch television and play video games. The trial court sustained the prosecutor's objections based on lack of foundation, relevance, and in violation of the court's Evidence Code section 402 ruling, and struck the answer. Mayfield admitted he had never seen Taylor or Chapluk play video games.

36

Corral testified to his observations of the assault as described earlier. On cross-examination and redirect examination, Corral admitted he was not completely truthful during his interview with investigators and during his grand jury testimony but he attributed it to his fear of being taxed.

Pough testified concerning his conversations with Aguilar as described above. In return, Pough's indicated sentence for felony possession of stolen property was reduced from nine years to four years.

Hoffman, OCSD's lead investigator, testified concerning the investigation, including some of the inmate interviews he conducted. On cross-examination, Petrovich's defense counsel asked Hoffman about the interview where investigators played Garten's interview. Counsel stated, "Petrovich's sole statement to you that he adopted anything that Garten had said was that indeed -- and I'm paraphrasing. [¶] He said, 'No, [Garten] is pretty much right on the money except the fact that I never hit him.'" Hoffman replied, "That is true."

Forensic scientist Annette McCall testified DNA can be more difficult to obtain when blood is diluted in water.

After the prosecution's case-in-chief, Guillen filed an Evidence Code section 402 motion, which included a request to admit portions of Taylor's interviews with investigators. Guillen supported his motion with the following interview transcripts: (1) Taylor's interview with investigators on October 6, 2006, the day after Chamberlain's death; (2) Taylor's interview with investigators on October 11, 2006; (3) Petrovich's interview with investigators on October 6, 2006; and (4) Petrovich's interview with investigators on October 17, 2006.

Guillen sought to introduce the following statements:

On October 6, 2006, the following colloquy occurred:

"[Investigator]: Okay. And I'm just gonna [*sic*] show you another unlabeled photograph, unnamed, but it has a No. 6 by it. Do you recognize that person?

37

"[Taylor]: Sure.

"[Investigator]: Does that help you remember at all as to who might have been sitting next to Aguilar?

"[Taylor]: It -- it could -- he could have been sitting next to him. I don't recall.

"[Investigator]: Okay.

"[Taylor]: But this -- this guy is the guy that kind of calls the shots for the whites in -- in the tank.

"[Investigator]: The guy that's labeled in No. 6.

"[Taylor]: Yeah.

"[Investigator]: And I think his last name is Petrovich.

"[Taylor]: (Inaudible)."

On October 11, 2006, Taylor was represented by counsel and was advised of his *Miranda* rights. The following colloquy occurred:

"[Investigator]: Okay. Well I want to show you a color photograph that -- that is unlabeled and see if you recognize that person in the photograph.

"[Taylor]: He looks familiar.

"[Investigator]: Okay. But you're not sure?

"[Taylor]: Well I couldn't tell you his name off the top of my head.

"[Investigator]: Okay. This person, do you recognize him as an inmate that was assigned to F Barracks during this incident or not?

"[Taylor]: Yeah, he -- he looks familiar, and yeah, he could be in F Barracks.

"[Investigator]: Okay.

"[Taylor]: I mean the -- the tattoo on the neck looks -- looks like one of the guys that I had in there.

38

"[Investigator]: Okay. This person, that the photograph doesn't exactly depict, has two stars tattooed, one on either side of the neck.

"[Taylor]: Okay.

"[Investigator]: Does that help with your memory at all?

"[Taylor]: Yeah, it -- it looks like one of the guys that's in there -- in F. (Showed picture of . . . Petrovich) [¶] . . . [¶]

"[Investigator]: . . . Yeah, just a quick question. If we take [p]icture No. -- the first picture that you were shown --

"[Taylor]: Right.

"[Investigator]: -- and I'm just gonna [*sic*] put [n]umber 1 on the back.

"[Taylor]: Okay.

"[Investigator]: You said that he looks somewhat familiar but not by name. Do you know him in that barrack situation as being anybody with a title in that subculture? Like if somebody said go get the house mouse, would that be the mouse house, or do you know him to have any unofficial title in the jail?

"[Taylor]: I -- I'm -- I'm gonna [*sic*] say no because I -- I had the -- the prior week off and that Thursday was my first day back.

"[Investigator]: Uh-huh.

"[Taylor]: And when I left prior there was a different Caucasian guy that, you know, was the spokesman, if you will.

"[Investigator]: Okay.

"[Taylor]: So that -- that guy is the one that I would recognize as that person.

"[Investigator]: Okay.

"[Taylor]: But it was my understanding that he's not in there, so if this guy says he is, that would have been new to me."

In his motion, Guillen cited to Petrovich's statements on October 6, 2006, and October 17, 2006, where he told investigators a deputy, Taylor, wanted to see the "'White rep,'" told him to listen to a conversation with another deputy, and asked him if he understood. Guillen argued Taylor's statements were contradictory and were circumstantial evidence of Taylor's state of mind and admissible for a nonhearsay purpose. Alternatively, he argued Taylor's statements were admissible under Evidence Code section 1250, the state of mind exception. Guillen claimed Taylor's statements were trustworthy because he had no motive to deceive investigators during his first interview, which was immediately after the assault, and the interview was recorded. He argued Taylor's statements were relevant to his state of mind and corroborated Petrovich's statement Taylor asked to see him.

The prosecution opposed Guillen's motion to admit Taylor's statements to investigators. The prosecutor argued Taylor's statements were hearsay, were inadmissible under Evidence Code section 1250 because they were untrustworthy, were irrelevant, and were inadmissible under Evidence Code section 352.

At a hearing on Guillen's motion, the trial court said it had read and considered the moving papers and the interview transcripts and heard argument. All defendants joined in Guillen's motion. The court denied Guillen's motion, explaining Taylor's statements were hearsay because Guillen was attempting to establish Taylor knew Petrovich was the Woods shot caller and Taylor's statement "does not fit in [the court's] judgment the definition of state of mind as is reflected in Evidence Code section 1250." The court opined the relevance of Taylor's statements was "suspect . . . because there's not a world of difference between what Taylor said in the first interview and what he said in the second interview." The court added that considering the evidence's "probative value is essentially nonexistent" admission of the evidence would result in undue consumption of time. The court continued that although it is "not really a significant issue," Taylor's statements were untrustworthy. The court concluded Taylor's

40

statements were not subject to cross-examination. Guillen's counsel argued the trial court's ruling violated their right to due process. The court concluded it had again reviewed Taylor's statements and opined they are of "minimal relevance" and reaffirmed its ruling denying defendants' motion to admit the statements.

## 2. Defense Evidence

Carlstrom, Petrovich, and Villafana rested on the state of the evidence. Carlstrom admitted he kicked Chamberlain one time and was guilty of battery, not murder. Petrovich argued he was not guilty of murder under any theory. Villafana admitted he hit Chamberlain twice and was guilty of two batteries but not murder.

### a. Guillen

Guillen argued he only committed four batteries, a kick to Chamberlain's leg and three slaps with a shoe to his stomach, and he participated because he was afraid. Guillen argued he was guilty of involuntary manslaughter.

Guillen offered witnesses who testified deputies inappropriately used shot callers to tax other inmates. Mayfield said the previous Woods shot caller in F Barracks was Keith Counts ("Sick Dog"). Mayfield's bunk was near the door so he was the barracks "doorman" and held the door open for inmates coming back from chow. He saw the deputies meeting with shot callers and saw Taylor taking shot callers through the door. He remembers Taylor telling all the inmates in F Barracks the taxing had gone too far and he did not approve.

Reilly testified F Barracks was a very dangerous place and he was a victim of taxing. About a week before Chamberlain's murder, Carlstrom told Reilly to bring paperwork from his court appearance but he did not and was taxed. Reilly was hit below the neck and above the waist. He told deputies his wounds were self-inflicted because he did not want to cause trouble for himself. He believed deputies played a part in making F Barracks a dangerous place. On cross-examination, Reilly testified he had a court date and inmates told him beforehand to return with his paperwork to prove why he was in

41

custody. Reilly stated inmates taxed him because he did not bring back his paperwork. When the prosecutor asked Reilly who told him to return with his paperwork, Carlstrom's defense counsel requested a sidebar.

In chambers, Carlstrom's counsel argued it was irrelevant whether it was Carlstrom who asked for Reilly's paperwork because Reilly assumed inmates attacked him because he did not return from court with it. The prosecutor argued he was not going to examine Reilly on this issue until Guillen's defense counsel elicited testimony from Reilly that he lied about his injury when inmates taxed him. The prosecutor believed Reilly would testify (1) Carlstrom asked him for his paperwork, (2) Carlstrom was in the vicinity when inmates taxed him, and (3) Carlstrom dissuaded Reilly from seeking medical attention. Carlstrom's counsel agreed when the trial court said Evidence Code section 1101 might be applicable. The prosecutor disagreed, arguing the evidence was admissible as to why Reilly was in fear and as to his credibility. Carlstrom's counsel contended Guillen's counsel could not "open the door" for Carlstrom, and the jury would infer it was prior bad act evidence. When the court asked the prosecutor whether part of his offer of proof was to show inmates regularly ask other inmates for their paperwork, the prosecutor said "that's part of it, but that's really not [his] purpose in exploring this area[,]" explaining it was Reilly's fear and credibility he sought to explore. The court excluded evidence Carlstrom was in the vicinity when inmates taxed Reilly and evidence Carlstrom dissuaded Reilly from seeking medical treatment on relevance and Evidence Code section 352 grounds. The court admitted evidence Carlstrom asked Reilly for his paperwork, stating "that part is admissible for a variety of reasons."

When cross-examination continued, Reilly said Carlstrom asked him to bring his paperwork back from court. Reilly said inmates told him they were taxing him because he did not have his paperwork. Reilly stated he lied to deputies about his injuries because he did not want to be taxed again.

42

Kohler testified he worked F Barracks in 2006 to 2007. A deputy's duties included patrolling the barracks every 30 minutes to prevent inmates from violating rules, check on inmate health and safety, and to allow interaction with the inmates. Kohler did not know who the shot callers were in the barracks. He knew other deputies used shot callers, but he did not think it was appropriate to involve inmates in performing his duties. Kohler felt it was dangerous to confer special status on certain inmates because regular inmates would perceive CAR management as having special authority. When Guillen's defense counsel asked Kohler if OCSD had protocols on use of the pepper ball gun, the trial court sustained the prosecutor's Evidence Code section 402 objections. Before Petrovich's defense counsel cross-examined Kohler, he asked for a sidebar.

At an in-chambers discussion, Petrovich's counsel inquired about the trial court's rulings concerning the pepper ball gun. The court explained it sustained the objection because Guillen's defense counsel inquired about OCSD policy. Petrovich's counsel stated he wanted to establish the OCSD policy on use of the pepper ball gun and that Taylor violated the policy. The court repeated its ruling that evidence concerning Taylor, Chapluk, and Le may be admissible, not that it was admissible. The prosecutor argued the court previously ruled on this issue. The court said OCSD policy on use of the pepper ball gun was irrelevant to whether inmates were in fear. Petrovich's counsel argued the pepper ball gun was a military grade weapon that would strike fear in people. The prosecutor argued none of the defendants witnessed a deputy use the pepper ball gun and the evidence was irrelevant. The court sustained the objection, agreeing evidence of OCSD policy on use of the pepper ball gun was irrelevant.

When cross-examination resumed, Petrovich's defense counsel returned to the subject of OCSD policy with Kohler. The trial court sustained the prosecutor's Evidence Code section 402 objections on whether it was against OCSD policy for inmates to have control over other inmates, for a deputy to use the CAR system, or for a deputy to make personal notes on an inmate's mod card.

43

Guillen offered Le's testimony. He was granted immunity for his testimony at the Grand Jury and at trial. Le testified Taylor was clearly in charge of F Barracks. Taylor interacted with shot callers approximately three times a shift and used them to communicate with the inmates. Le stated "'getting with the program'" meant following the rules so deputies would have to do as little work as possible. Le admitted deputies did not conduct regular floor sweeps but would rather look out the window and say it was secure. Le was instructed that every 30 minutes he was to record in the log the barracks was secure if nothing major happened. They would often watch television and movies in the guard station. Le stated Sramek called him on October 5, 2006, and he forwarded the information to Taylor and Chapluk when they returned, and they interviewed Chamberlain. Le did not enter the call from Sramek into the log because it was discretionary. After Chamberlain was killed, Taylor told him to record the call in the log. Le claimed Taylor did not speak with any shot callers that day. He said that sometimes the mod cards were highlighted when the inmate had sex crimes, but he was not sure if Chamberlain's was. He acknowledged inmates with sex crimes were more vulnerable to assaults.

The next day, the prosecution filed an Evidence Code section 402 motion requesting the trial court exclude Chapluk's anticipated testimony concerning Taylor's use of the pepper ball gun because it was irrelevant, unduly prejudicial, and inadmissible character evidence. Additionally, the prosecution argued the evidence lacked foundation because there was no evidence any of the defendants witnessed Taylor use the pepper ball gun or that they were motivated by fear he would use it the day of Chamberlain's killing.

At a hearing on the prosecution's motion before Chapluk was recalled to testify, the trial court indicated it had read and considered the motion. Petrovich's defense counsel argued Petrovich told an investigator he acted out of fear, and Taylor's use of the pepper ball gun contributed to the violent and fearful environment in

44

F Barracks. Petrovich's counsel said Petrovich could testify Taylor used the pepper ball gun based only on indirect knowledge. Guillen's defense counsel stated Guillen was in F Barracks during two incidents but only learned about them by "reputation." The court ruled evidence Taylor improperly used a pepper ball gun was inadmissible because there was no foundation. The court added that if defendants could submit the proper foundation through admissible evidence, the court would admit the evidence.

Chapluk testified Garcia was the Paisanos shot caller in October 2006, and Chapluk used Garcia to convey information to inmates. Chapluk admitted that if deputies had a problem with an inmate they would ask the shot caller to gather intelligence. Deputies knew the shot callers had authority over the other inmates in their CAR, and a shot caller would likely tax an inmate who defied him. Chapluk did not believe the use of shot callers conveyed authority to inmates. Deputies utilized the inmates' infrastructure to convey information and not to empower CAR leadership. On cross-examination, Chapluk claimed they never told a shot caller to tax an inmate for violating the rules; deputies would discipline inmates.

Hoffman testified that when he interviewed Guillen on December 26, 2007, Guillen stated he kicked Chamberlain on the lower part of his legs because he had not gone very far into the cube. Guillen also said he put his shoe on his hand and slapped Chamberlain's stomach.

Daniel Vasquez testified as a consultant on the correctional system. Vasquez explained the CAR system was "a racial alignment of inmates" created by the inmates in the 1950s. Correctional officers had to either control the housing unit and not allow inmate leadership roles or rely on the CAR system. Officers diminish their authority when they rely on the CAR system and create fear in and alienate inmates who are not in the CAR structure. When a deputy personally talks to a shot caller other inmates notice. If a deputy goes to a shot caller regarding a problem inmate, the shot caller will tax the inmate if he is defiant. If a shot caller defies a deputy, the shot caller

45

will be moved and lose his power. Inmates increase their status within the CAR by committing violent acts. A way to demonstrate leadership is to "take out the trash" or "get rid of a child molester." Vasquez stated sex offenders are frequently taxed, but they are not always killed. However, he was familiar with cases in which inmates had killed child molesters in their own CARs. He said members of Guillen's CAR, the Paisanos, speak very little English. He added that in the Paisanos the house mouse is frequently someone who can speak English and act as an interpreter. When Guillen's defense counsel asked Vasquez whether a deputy's delegation of authority violated the Penal Code, the trial court sustained the prosecutor's objections and struck the answer.

*b. Aguilar*

Aguilar contended he was misidentified as an assailant. In support of his defense, Jerry Ibarra testified he was playing cards with Petrovich and two other inmates when someone approached the table and said they needed to get Aguilar to stop the attack. Ibarra looked and saw Aguilar in Ibarra's cube upstairs. Aguilar came to the table, went to D cube, and came back and asked for help because someone was unconscious. Ibarra, who knew CPR, went with Aguilar to D Cube and saw reddish-orange colored liquid on the floor. Chamberlain was sitting with his back against a bunk. Ibarra did not try to give CPR because Chamberlain had bruising from his chin down to his chest. It looked like his neck was broken. Ibarra said they "'need[ed] to call man down.'" Aguilar frantically tried to call man down but deputies did not arrive until five to 10 minutes later. Taylor announced "'day room closed'" and entered D cube. Taylor slapped Chamberlain, attempted to pick him up, and dropped him. Ibarra heard Taylor say, "'I didn't say to kill the guy.'" Ibarra also stated he saw Petrovich reenter F Barracks earlier that day after being outside with Taylor. Ibarra was housed next to Aguilar three months prior to trial, which is when he contacted Aguilar's attorney for the first time and provided these details.

46

## 3. Prosecution's Rebuttal

The prosecution and Guillen stipulated there was a blood stain on his left shoe. In Ibarra's interview the morning after the murder, he told investigators that he was playing cards and did not know what was going on. Ibarra also said he never walked to D cube and did not see anything. He denied being a doctor but did tell someone to get medical assistance. Ibarra was released from custody after the murder on October 29, 2006, and arrested in connection with a new case on April 19, 2011. Aguilar and Ibarra were housed in cells next to each other from June 6, 2011, to July 1, 2011.

It was stipulated that private investigator Alfredo Rasch interviewed Ibarra twice in early July 2011 on behalf of Aguilar, and would testify to the following: Ibarra told Rasch that prior to October 5, 2006, he saw Taylor talking with shot callers on multiple occasions. However, there is no indication Ibarra said Taylor met with Petrovich that day or that they questioned him about it. Ibarra heard "rumors that something was going to happen to a suspected child molester." After Taylor entered D cube, he grabbed, smacked, shook, and threw Chamberlain against the wall. Taylor told the inmates "they were not to say anything about what they saw him do to Chamberlain" and "to pretend they had seen nothing." Investigator Kelly Core of the OCDA interviewed Ibarra on September 9, 2011. Ibarra was shown a picture of Taylor and said he did not recognize him. Taylor looked the same in the picture except that he had a moustache. The evidentiary portion of the trial ended on September 29, 2011. The DA Report was not admitted into evidence at trial.

## 4. Jury Instructions

Throughout the trial and after the close of evidence, the trial court instructed the jury it could only consider each defendant's statements against that respective defendant. The trial court instructed the jury the prosecution was proceeding on four theories of murder, "malice aforethought," "aiding and abetting – natural and probable consequences," "conspiracy," and "felony murder," and detailed which theories

47

were applicable to first degree murder and which theories were applicable to second degree murder. The court instructed the jury on each of the theories. The court also instructed the jury on the lesser included offenses of voluntary and involuntary manslaughter. As relevant here, the court instructed the jury on involuntary manslaughter based on an unintentional but criminally negligent homicide committed during the course of a misdemeanor, a battery. Finally, the court instructed the jury it could consider Chamberlain's statements to Palacios and Chapluk to evaluate Chamberlain's state of mind and his conduct and not for their truth.

5. *Jury Deliberations*

Jury deliberations began the morning of October 3, 2011. At the end of the day, the jury requested the following: (1) Pough's testimony; (2) Palacios's testimony concerning the number of times and when Guillen entered D cube; (3) Carlstrom's cross-examination of Palacios concerning "the number and composition of the groups that entered D cube," and (4) Reilly's testimony concerning who taxed him. The trial court ordered the jury to return the following day at 1:30 p.m. The jury retired for the day after deliberating for a total of about four and one-half hours. The following morning, the trial court discussed with counsel how to respond to the jury's requests. That afternoon, the court advised counsel one of the jurors had called and indicated she had a medical emergency. The parties stipulated to excuse the juror, which the court did for good cause. The court indicated it would contact an alternate juror and determine whether the alternate juror could arrive that afternoon. The court indicted it would instruct the jury with CALCRIM No. 3575, "Substitution of Alternate Juror: During Deliberations." The following colloquy occurred:

"[Guillen's counsel]: One question. In the interim there was a question by the jury that is currently impaneled. How does the court intend on handling that in bringing the alternate that's going to be selected up to speed with the questions that were asked and the rereads that were requested?

48

"[Trial court]:  Well, my feeling is, folks, and see if you agree with this, I think we can go ahead and read back that testimony and give the answers that I gave. The jury would then have to go back and commence their deliberations all over again, and I think that we simply answer that question as agreed upon.

"[Prosecutor]:  We agree with that.  I think that's the appropriate way to handle it, and the court maybe can tell them, even though you're starting all anew, there was a question that was still pending, and it is the intent of the court to give the answer.

"[Trial court]:  That's good.  [¶]  You agree . . . ?

"[Carlstrom's counsel]:  Yes, your honor.

"[Trial court]:  Agreed . . . ?

"[Guillen's counsel]:  And I also think, if I may, I think if the alternate juror that is going to be seated should look at what was requested so they have at least some context of what was requested before they were impaneled and then the reread be given.

"[Trial court]:  Well, to tell you the truth here, how that will operate just as a matter of procedure, that form is going to go back into the jury room because my answer is on there.

"[Guillen's counsel]:  Oh, I see.

"[Trial court]:  It said, 'will be reread, will be reread, and then the second will be reread, and the last one will say 'there is no such testimony' or whatever that was. [¶]  Is that agreeable with everybody?"

The prosecutor and all defense counsel agreed.

Proceedings reconvened that afternoon, the court clerk swore in the alternate juror, and the trial court advised the jury it excused an ill juror and replaced that juror with an alternate juror.

The trial court stated:  "Next we received your form request, and I have answered it.  My answers are on the form.  The court reporter is going to reread some testimony for you folks.  And then the answer to the last question that you asked about

49

the witness Reilly, I have my answer on that form. It's written out on the form. It's very brief. So that will be like the next order of business. When you get back there, you're going to have some testimony reread. [¶] But what do you do now? Okay. I got an instruction for you. We got one for everything because now you have an alternate. Okay. [¶] Here we go: 'One of your fellow jurors has been excused and an alternate juror has been selected to join the jury. Do not consider this substitution for any purpose. The alternate juror must participate fully in the deliberations that lead to any verdict. The People and the defendants have the right to a verdict reached only after full participation of the jurors whose votes determine that verdict. This right will only be assured if you begin your deliberations again from the beginning. Therefore, you must set aside and disregard all past deliberations and begin your deliberations all over again. [¶] 'Each of you must disregard the earlier deliberations and decide this case as if those earlier deliberations had not taken place. Now please return to the jury room and start your deliberations from the beginning.' [¶] I imagine the first thing you're going to get is a reread. Appreciate your patience on this one, folks. I hope we don't have any other new adventures here."

The newly impaneled jury began deliberations at 3:07 p.m. At 3:14 p.m., the court reporter read back the requested testimony over the course of one-half hour. The court informed the jury Reilly did not identify who taxed him. The jury deliberated for nine days.

On October 24, 2011, the jury submitted to the trial court a note that stated, "'We regretfully cannot come to a unanimous decision on any of the five defendants. We have tried and tried with no success.'" After a lengthy discussion in chambers with counsel, the trial court, in open court, examined the jury foreperson regarding the jury's deliberations. The foreperson stated the jury had taken four ballots on all the defendants except Aguilar, on whom it had taken five ballots. After some questioning, the foreperson indicated the jury had only taken votes on first degree murder and was unable

to reach unanimous verdicts on that offense. During an in chambers discussion, the prosecution requested the trial court instruct the jury to no longer consider first degree murder and proceed deliberating on second degree murder and the lesser included offenses. That afternoon, the trial court instructed the jury to not deliberate any longer on first degree murder and instead deliberate on second degree murder and the lesser included offenses of voluntary and involuntary manslaughter.

Jury deliberations resumed. The following day, after less than five hours of deliberations, the jury convicted Aguilar, Carlstrom, Guillen, Petrovich, and Villafana of second degree murder.

6. *Sentencing*

At a hearing, the trial court found Guillen's three prior convictions true and dismissed the two strike priors. The court sentenced Guillen to 20 years to life in prison, 15 years to life for second degree murder and five years for the prior serious felony conviction. The court imposed a $200 restitution fine (§ 1202.4, subd. (b)), and a $200 parole revocation restitution fine (§ 1202.45).

The trial court sentenced Aguilar to 15 years to life in prison for second degree murder. The court imposed a $240 restitution fine (§ 1202.4, subd. (b)), and a $240 parole revocation restitution fine (§ 1202.45). The court sentenced Petrovich to 15 years to life in prison for second degree murder. The court imposed a $240 restitution fine (§ 1202.4, subd. (b)), and a $240 parole revocation restitution fine (§ 1202.45).

Two months later, the court sentenced Carlstrom to 15 years to life in prison for second degree murder. The court imposed a $200 restitution fine (§ 1202.4, subd. (b)), and a $200 parole revocation restitution fine (§ 1202.45). The next month, the court sentenced Villafana to 15 years to life in prison for second degree murder. The court imposed a $200 restitution fine (§ 1202.4, subd. (b)), and a $200 parole revocation restitution fine (§ 1202.45).

DISCUSSION

## I. Sufficiency of the Evidence

Aguilar, Guillen, and Carlstrom argue insufficient evidence supports their second degree murder convictions under the following theories: malice aforethought—implied malice (the prosecutor did not argue express malice), aiding and abetting—natural and probable consequences, and conspiracy. Petrovich joins in co-appellants' arguments. Villafana does not argue insufficient evidence supports his conviction, although he does assert the evidence supporting his conviction was not overwhelming when discussing his other claims. He does not appear to join in his co-appellants' sufficiency of the evidence claims. Out of an abundance of caution, we will address whether sufficient evidence supports Villafana's conviction as well.

The record does not disclose which theory the jury relied on in convicting each of the appellants of second degree murder. (See *People v. Holt* (1997) 15 Cal.4th 619, 671 [reversal unnecessary when reviewing court can determine from record which theory jury relied on in convicting defendant].) Thus, we must determine whether there was sufficient evidence supporting appellants' second degree murder convictions under each theory of second degree murder. (*People v. Majors* (1998) 18 Cal.4th 385, 408 [where separate theories of liability jury need not decide unanimously under which theory defendant guilty so long as each juror convinced beyond reasonable doubt defendant guilty of charged crime]; *People v. Raley* (1992) 2 Cal.4th 870, 886 [sufficient evidence supported each theory of murder].)

## A. Standard of Review

"'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.]

52

"Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508 (*Cravens*).)

B. *Malice Aforethought-Implied Malice*

"Section 187, subdivision (a), defines murder as 'the unlawful killing of a human being, or a fetus, with malice aforethought.' . . . Murder is divided into first and second degree murder. [Citation.] 'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder. [Citations.]' [Citation.] [¶] Critical for our purposes is that the crime of murder, as defined in section 187, includes, as an element, malice. Section 188 defines malice. It may be either express or implied. It is express 'when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.' [Citation.] It is implied 'when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' [Citation.] This definition of implied malice is quite vague. Trial courts do not instruct the jury in the statutory language of an abandoned and malignant heart. Doing so would provide the jury with little guidance. 'The statutory definition of implied malice has never proved of much assistance in defining the concept in concrete terms.' [Citation.] Accordingly, the statutory definition permits, even requires, judicial interpretation. We have interpreted implied malice as

53

having 'both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." [Citation.] The mental component is the requirement that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." [Citation.]' [Citation.]" (*People v. Chun* (2009) 45 Cal.4th 1172, 1181 (*Chun*), fn. omitted; *People v. Bryant* (2013) 56 Cal.4th 959, 965 (*Bryant*); *People v. Knoller* (2007) 41 Cal.4th 139, 151-152 (*Knoller*).)

*Cravens, supra,* 53 Cal.4th 500, is instructive. In *Cravens*, defendant and his confederates confronted the victim, and a fight ensued. Defendant's friend fought the victim first, and then all of the men kicked the victim. The victim was able to get up, but he was intoxicated, exhausted, and unsteady. The victim said something to defendant about jumping him at his house. Defendant "'coldcocked'" the victim while he was looking the other way, and the victim went unconscious, fell, and his head hit the concrete so hard neighbors heard the cracking sound. (*Id*. at pp. 504-505.) After the fight, defendant bragged to friends he had not fought the victim but, rather, had "'punched him out'" and "'put him to sleep.'" (*Id*. at p. 506.) The victim died of a skull fracture. (*Id*. at p. 505.) The Court of Appeal reversed defendant's second degree murder conviction, concluding there was insufficient evidence of implied malice because "'[a] single fist blow to the head does not involve a high probability of death simply because it occurs on pavement, and awareness that the recipient of such a blow might fall and hit his or her head on the pavement is merely awareness of a risk of serious bodily injury, not conscious disregard for life.'" (*Id*. at p. 507.)

The California Supreme Court reversed the Court of Appeal. (*Cravens, supra,* 53 Cal.4th at p. 512.) The court concluded sufficient evidence "supported both the physical and mental components of implied malice." With respect to the physical component, the court concluded "the manner of the assault and the circumstances under which it was made rendered the natural consequences of defendant's conduct dangerous

54

to life." The court relied on the fact defendant was taller and bigger than the victim, and the victim was intoxicated, exhausted from the altercation, and vulnerable. Further, defendant inflicted a hard punch that was a "sucker punch." (*Id.* at pp. 508-509.) As to the mental component, the court found defendant's prior conduct (he had a history of punching people in this manner) and after the punch (bragging to his friends) showed defendant committed second degree murder. (*Id.* at pp. 510-511.) We will now address the physical and mental components of implied malice second degree murder in this case.

*1. Physical Component*

The physical component is satisfied when the defendant commits an inherently dangerous felony, """"the natural consequences of which are dangerous to life."""" (*Chun, supra,* 45 Cal.4th at p. 1182.) "This state has long recognized 'that an assault with the fist . . . may be made in such a manner and under such circumstances as to make the killing murder.' [Citation.] However, 'if the blows causing death are inflicted with the fist, and there are no aggravating circumstances, the law will not raise the implication of malice aforethought, which must exist to make the crime murder.' [Citation.]" (*Cravens, supra,* 53 Cal.4th at p. 508.)

Similar to *Craven*s, the manner of the assault on Chamberlain and the circumstances under which it was made rendered the natural consequences of each appellant's conduct dangerous to life. Inmates despise child molesters. Although there were ground rules for taxing (body blows for a specified period of time by an inmate's own CAR), those rules did not apply to child molesters. All CARs could tax an inmate who was, or who was believed to be, a child molester. Petrovich, the Woods shot caller and the person who had to authorize Chamberlain's taxing, said child molesters are among the most despised in jail and there are "no rules" on taxing them. He described this as a long established rule of jail culture and said "there's no remorse, . . . there's no nothing [*sic*] for them."

55

Pursuant to Petrovich's authorization, Aguilar escorted Chamberlain to one of the only places in F Barracks where even a diligent and interested deputy would not be able to observe the attack, D cube's blind spot. Over the course of about 30 minutes, at least 30 and by some accounts 50 inmates participated in the assault on Chamberlain, hitting him, kicking him, stomping on him, spanking him, spitting on him, urinating on him, spilling hot coffee on him, stripping off his clothes, and putting foreign items in his rectum. When inmates beat Chamberlain unconscious, they threw water on him to wake him up and then continued beating him.

Chamberlain's injuries were consistent with a high-velocity car accident or a fall from multiple stories. Every region of Chamberlain's body had blunt force trauma injuries except part of his abdomen likely from rolling into a ball to protect himself. He had vivid injuries on his face and scalp. Chamberlain's entire back was hemorrhagic, and the front of his torso was also hemorrhagic in a few concentrated areas. Chamberlain had a total of 43 rib fractures and most were severely misplaced; 21 of his 24 ribs were broken. He had a punctured lung. He also had three injuries to his anus and rectum that were consistent with penetration by a long, slender instrument. Needless to say, the natural consequences of *all* this conduct was dangerous to Chamberlain's life. We now address each of the appellants' conduct to determine whether they contributed to Chamberlain's death.

*a. Petrovich*

Petrovich argues the majority of the evidence established he did not touch Chamberlain in any way. As we explain below, there was overwhelming evidence Petrovich authorized inmates to tax Chamberlain because they believed he was a child molester and there was evidence from which the jury could reasonably conclude Petrovich was the first person to hit Chamberlain.

In three different interviews with investigators, Petrovich admitted he authorized the attack, first by telling the South-Siders shot caller and then by telling other

inmates Chamberlain was a child molester and would be taxed.  Although he may not have been the first one to use the phrase, Petrovich agreed he "lit the fuse."  Although there was testimony Petrovich left D cube before the assault started and he did not hit Chamberlain, Palacios testified Petrovich was the first person to hit Chamberlain.  The testimony of a single witness is sufficient to support a conviction unless the testimony is physically impossible or inherently improbable.  (*People v. Jones* (2013) 57 Cal.4th 899, 963-964.)  Contrary to Petrovich's claim Palacios was not credible because he was too far away, Palacios's testimony was not physically impossible and inherently improbable, and the jury could properly rely on his testimony to conclude Petrovich hit Chamberlain.  Nor are we persuaded by Hoffman's testimony Petrovich denied hitting Chamberlain because first it does not match what the transcript of the interview says and second because it was self-serving and the jury could discount it.  The jury is the sole and exclusive judge of the facts, and we cannot substitute our judgment for the jury's.  (*Cravens, supra,* 53 Cal.4th at pp. 507-508.)

*b. Aguilar*

Aguilar states, "It is indisputable that [his] conduct was likely to inflict great bodily injury upon [Chamberlain]."  He claims though "the aggravated assault . . . was not an inherently dangerous felony."  Nonsense.

The evidence established the natural consequences of Aguilar's conduct alone could have killed Chamberlain.  Aguilar does not seem to dispute he escorted Chamberlain to D cube.  And he concedes he inflicted great bodily injury on Chamberlain.  There was overwhelming evidence Aguilar hit and kicked Chamberlain multiple times.  Aguilar had rubber soled shoes on his hands so he could continually hit Chamberlain and minimize the discomfort to his hand, which he later complained about to another inmate.  Three witnesses provided testimony from which the jury could reasonably conclude Aguilar grabbed hold of a bunk for leverage, jumped up, and ruthlessly stomped on Chamberlain.  Aguilar asserts it is purely speculative to conclude

57

his conduct caused Chamberlain's death. Based on our review of the entire record, Aguilar's conduct was likely the most egregious. Indeed, the record supports the conclusion Aguilar's conduct resulted in some of Chamberlain's rib fractures, a contributing factor in his death. The record also supports the conclusion Aguilar's participation was not just limited to the beginning of the assault. One witness testified Aguilar threw water on an unconscious Chamberlain to wake him up and continued to beat him. Finally, one injury, although not fatal, demonstrates the depravity of Aguilar's conduct. After the attack, Aguilar repeatedly told an inmate he was most concerned not with Chamberlain's death, but with the fact he put a pencil in his rectum. This evidence demonstrates the natural consequences of Aguilar's conduct was dangerous to Chamberlain's life.

### c. *Carlstrom*

Like Aguilar, Carlstrom contends there is no evidence his conduct "posed a high probability of death." We disagree.

Carlstrom concedes the evidence at trial established he kicked Chamberlain two times. There was other testimony, however, including Carlstrom's own admissions, that establish Chamberlain was particularly vulnerable when Carlstrom kicked him and additionally Carlstrom did not merely kick Chamberlain twice. In his first interview with investigators, Carlstrom admitted that when he went into D cube Chamberlain "was pretty messed up." Nevertheless, Carlstrom kicked Chamberlain twice sending a defenseless and severely injured Chamberlain into the wall. One witness described at least one of Carlstrom's kick as "forceful." Moreover, there was other testimony that contradicted Carlstrom's claim his conduct was limited to two kicks. A witness testified he saw Carlstrom hold onto a bunk for leverage and jump up and down on something behind the short wall. Like Aguilar, this conduct was evidence Carlstrom caused Chamberlain's rib fractures, which contributed to his death. The jury could

58

reasonably rely on this evidence to conclude the natural consequences of Carlstrom's conduct was dangerous to Chamberlain's life.

d. *Villafana*

Villafana asserts there was insufficient evidence his brief conduct in the earlier stages of the assault endangered Chamberlain's life. Again, we disagree.

Contrary to Villafana's assertion otherwise, one witness saw Villafana make multiple trips between working out in E cube and going into D cube. One witness saw Villafana hit Chamberlain twice with a closed fist. And another witness testified he saw Villafana hit and kick Chamberlain on his head and torso. The forensic evidence established Chamberlain would not have died without the head and rib injuries. The jury could rely on this evidence to conclude Villafana contributed to the injuries that were ultimately fatal. Thus, there was sufficient evidence to conclude the natural consequences of Villafana's conduct was dangerous to Chamberlain's life.

e. *Guillen*

Guillen does not really dispute there was sufficient evidence of the physical component as to him. Instead, he focuses on the mental component. Nevertheless, we address whether there was sufficient physical evidence to establish the natural consequences of Guillen's conduct were dangerous to Chamberlain's life. We conclude there was.

In his interview with investigators, Guillen admitted he kicked Chamberlain one time on the leg. Guillen also admitted he removed his shoe and hit Chamberlain with it three times on the stomach. One witness testified he saw Guillen enter D cube, get on his knees, and make a couple downward striking motions during the beginning or middle of the attack. Again, the forensic evidence established Chamberlain's rib injuries would have been fatal. The jury could reasonably rely on this evidence to conclude Guillen's conduct of striking Chamberlain in the abdomen area was dangerous to Chamberlain's life because it contributed to the injuries that ultimately caused his death.

59

*2. Mental Component*

The mental component is satisfied when the defendant commits an act resulting in death knowing his conduct endangers the life of another and who acts with a conscious disregard for life. (*Chun, supra,* 45 Cal.4th at p. 1182; *Knoller, supra,* 41 Cal.4th at p. 156.) This component is ordinarily proven by illustrating the circumstances leading to the ultimate deadly result. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 107 ["very nature of implied malice . . . invites consideration of the circumstances preceding the fatal act"].)

*a. Petrovich*

Petrovich argues evidence of the mental component is lacking because he believed it was going to be a typical taxing, i.e., inmates would punch Chamberlain for about 16 seconds while Chamberlain stood against the wall. Petrovich's statements, however, establish he authorized the taxing and knew very well what would happen to Chamberlain.

As we explain above, Petrovich repeatedly admitted to investigators that as the Whites' shot caller, he authorized the taxing of Chamberlain, who was also Caucasian. Petrovich explained that because the South-Siders ran F Barracks, he had to get their shot caller's blessing, which he did. During his first interview, Petrovich said he told the South-Siders shot caller to "do whatever." Petrovich also admitted he told other inmates Chamberlain would be taxed. Additionally, witnesses testified they saw Petrovich meeting with Aguilar, and Aguilar escorting Chamberlain to D cube. Although Petrovich complains the phrase did not originate with him, he agreed he "lit the fuse." During his second interview, Petrovich told investigators there are no rules on taxing child molesters because they are considered among the worst by inmates. During his third interview, he said the general rule that an inmate could only be taxed by inmates of the same CAR does not apply to child molesters and everyone can participate in the taxing. He said that when it comes to taxing child molesters, """They're wide open."""

60

This evidence demonstrates Petrovich knew his conduct endangered Chamberlain's life and he acted with a conscious disregard of Chamberlain's life thereby establishing the mental component of implied malice.

b. *Aguilar*

Aguilar claims there was no evidence he "was aware of the extent of damage that had been inflicted before he did so." We find that difficult to believe as the evidence established Aguilar participated in the attack from beginning to end.

Aguilar was the Woods' right-hand man and torpedo. One witness overheard Petrovich tell Aguilar there was going to be a beating of a "'Chester'" who admitted he likes young children. Aguilar went to J cube, escorted Chamberlain to D cube, and pushed Chamberlain to the ground.

Aguilar's own conduct contradicts his claim this was a typical taxing, he was not aware of Chamberlain's injuries, and he did not know of the severity of the wounds he personally committed. Again, there was overwhelming evidence Aguilar repeatedly hit and kicked Chamberlain and he put a pencil in his rectum. But that is not the extent of the damage Aguilar inflicted. Three witnesses testified Aguilar held onto a bunk for leverage and stomped up and down on Chamberlain. One witness described Aguilar's conduct as "ruthlessness." Aguilar hit Chamberlain so hard his hand hurt. When Chamberlain passed out, Aguilar threw water on him and continued to beat him. It defies logic to argue one has not endangered the life of another and acted with a conscious disregard for life after maximizing your vertical leap to stomp on a defenseless person and injuring yourself hitting them. Finally, one witness testified he saw Aguilar repeatedly exit D cube, speak with Petrovich, and then return to D cube. This evidence established Aguilar monitored the taxing and knew "'it got out of hand.'" Thus, there was overwhelming evidence establishing the mental component of malice as to Aguilar.

61

*c. Carlstrom*

Carlstrom asserts the evidence established that at most he knew his "conduct contained a risk of serious bodily injury," which is insufficient to establish the mental component of implied malice. Once more, we disagree.

Carlstrom admitted he asked Chamberlain for his paperwork when he first arrived but Chamberlain did not have it. Based on all the testimony about the CAR structure and its rules, the jury could reasonably conclude Carlstrom knew Chamberlain would be taxed for failing to provide his paperwork. The evidence not only established Carlstrom forcefully kicked a defenseless and "messed up" Chamberlain, but he also followed Aguilar's lead and grabbed onto the bunk for leverage and stomped on Chamberlain. We need not repeat that stomping on someone who has been severely beaten and is defenseless demonstrates a conscious disregard of life. Not only did Carlstrom participate in the assault, there was testimony he helped prolong it. A witness testified Carlstrom gave water to Aguilar and another inmate to throw on Chamberlain to wake him up so inmates could continue beating him. Carlstrom's comment to investigators concerning his state of mind is telling. He said, "everybody had a chance to have a turn" hitting and kicking Chamberlain. Therefore, sufficient evidence supports the mental component of malice as to Carlstrom.

*d. Villafana*

Villafana cursorily claims insufficient evidence supports the mental component of implied malice because his conduct was brief. It may have been brief, but it was particularly dangerous.

The evidence at trial established Villafana was the Paisanos shot caller and was present in D cube when he, Stretch, and Petrovich discussed beating and raping Chamberlain. Again based on the evidence concerning the culture of the CARs, the jury could reasonably conclude Villafana authorized the Paisanos to participate in the taxing and knew it was not going to be a typical taxing because they believed Chamberlain was

62

a child molester. Additionally, the evidence established Villafana himself brutally attacked Chamberlain. Witness testimony established Villafana hit Chamberlain twice with a closed fist, and hit and kicked him on his head and torso. Injuries to Chamberlain's head and ribs caused his death. Finally, one witness saw Villafana make multiple trips between working out in E cube and going into D cube demonstrating he knew Chamberlain's condition and did nothing to stop the attack. Thus, with respect to Villafana, sufficient evidence supports the mental component of implied malice.

*e. Guillen*

Guillen contends insufficient evidence established he acted with a conscious disregard for human life because there was no evidence he knowingly engaged in conduct that was dangerous to Chamberlain's life. Guillen focuses on the fact he was not privy to the shot callers' plan and he believed he was participating in a common taxing. But his conduct and his statements to investigators demonstrate he was subjectively aware his conduct was dangerous to Chamberlain's life.

Guillen repeatedly told investigators he knew Chamberlain was going to be taxed because he was a child molester. He also told investigators all Mexicans had to participate in the taxing. Guillen explained taxing is very common in jail and a typical taxing consists of 30 punches for 30 seconds. But he also stated the general rules do not apply to child molesters. He explained that generally each race taxes their own race but with child molesters everyone participates in the taxing. The jury could reasonably rely on Guillen's admissions to conclude he knew Chamberlain's taxing was not an ordinary taxing and everyone would participate.

Guillen admitted he kicked Chamberlain once in the legs with his right foot. Guillen also admitted he removed his shoe and hit Chamberlain with it three times on the stomach. Guillen's attempt to minimize his conduct by asserting he only inflicted superficial injuries is belied by the record. The record includes evidence Chamberlain was on his side, moving and screaming when Guillen hit him. One witness testified he

63

saw Guillen enter D cube, get on his knees, and make a couple downward striking motions. Guillen admitted he had a choice whether to participate and when he thought about someone molesting his young daughters, he wanted to hit Chamberlain. Although Guillen's assault of Chamberlain may not have been as violent as his co-appellants, his conduct and statements provided evidence from which the jury could reasonably conclude Guillen knew he endangered Chamberlain's life and he acted with a conscious disregard of Chamberlain's life thereby establishing the mental component of implied malice.

Relying on *United States v. Garcia* (9th Cir. 1998) 151 F.3d 1243 (*Garcia*), and *Mitchell v. Prunty* (9th Cir. 1997) 107 F.3d 1337 (*Mitchell*), overruled on other grounds in *Santamaria v. Horsley* (9th Cir.1998) 133 F.3d 1242, 1248, Guillen analogizes the CARs to criminal street gangs and argues the prosecutor improperly argued and the jury thus improperly relied on his CAR participation, he was the Paisanos house mouse, to infer his intent and convict him of second degree murder.

In *Garcia*, the issue was whether testimony concerning the existence of an implicit agreement among gang members to support one another in fights against rival gangs alone constituted sufficient evidence to support a conviction of conspiracy to commit assault. (*Garcia, supra*, 151 F.3d at p. 1244.) In *Mitchell*, the issue was whether evidence defendant was a gang member alone constituted sufficient evidence to support a conviction of murder under aiding and abetting principles. (*Mitchell, supra,* 107 F.3d at p. 1342.) These cases stand for the proposition that gang evidence standing alone cannot prove a defendant is an aider and abettor to a crime. These cases are inapposite.

As we explain above, Guillen's participation in the CAR was not the only evidence connecting him to the murder of Chamberlain. Guillen admitted he kicked Chamberlain once and hit him three times. Although Guillen told investigators he had to participate, he also admitted to investigators not everyone participated in the assault, he had a choice whether to participate, and he ultimately chose to go into D cube and hit

64

Chamberlain because he thought about someone molesting his young daughters. There was more evidence connecting Guillen to Chamberlain's murder than just his participation in the Paisanos. Sufficient evidence supported Guillen's conviction for second degree murder. Thus, sufficient evidence supported the conclusion each appellant was guilty of second degree murder under the implied malice theory.

## C. Aiding and Abetting-Natural and Probable Consequences

In *People v. Prettyman* (1996) 14 Cal.4th 248 (*Prettyman*), the Supreme Court articulated the principles of the natural and probable consequences doctrine. "'[An aider and abettor] is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets. . . . [¶] It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which . . . must be found by the jury.' [Citation.] Thus, . . . a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the 'natural and probable consequence' of the target crime." (*Id.* at p. 261; *People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).)

However, it is rarely, if ever true "that an aider and abettor can 'become liable for the commission of a very serious crime' committed by the aider and abettor's confederate [where] 'the target offense contemplated by his aiding and abetting may have been trivial.' . . . Murder, for instance, is *not* the 'natural and probable consequence' of 'trivial' activities. To trigger application of the 'natural and probable consequences'

65

doctrine, there must be a close connection between the target crime aided and abetted and the offense actually committed." (*Prettyman, supra,* 14 Cal.4th at p. 269.)

"Therefore, when a particular aiding and abetting case triggers application of the 'natural and probable consequences' doctrine . . . the trier of fact must find that the defendant, act[ed] with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime. But the trier of fact must also find that (4) the defendant's confederate committed an offense *other than* the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (*Prettyman, supra,* 14 Cal.4th at p. 262, fn. omitted.)

California cases have upheld convictions for murder or attempted murder where the jury was instructed a defendant's liability could result from aiding and abetting an assault or a battery. (See, e.g., *Medina, supra,* 46 Cal.4th at p. 922 [fistfight]; *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10-11 [assault—fistfight]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1055-1056 [assault—breach of the peace]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1375-1377 [assault—single knockdown punch]; *People v. Godinez* (1992) 2 Cal.App.4th 492, 499-500 [fistfight].)

*1. Target Offenses*

None of the appellants dispute there is sufficient evidence each of them committed a battery or assault with force likely to cause great bodily injury or aided and abetted the commission of those offenses. At trial, Guillen, Carlstrom, and Villafana admitted they either hit or kicked Chamberlain. And on appeal, Aguilar and Petrovich concede sufficient evidence supports the conclusion they aided and abetted either a battery or an aggravated assault.

Additionally, as we explain above in greater detail, sufficient evidence supports the conclusion each of the appellants played a role in the attack: Petrovich authorized the taxing and hit Chamberlain once; Aguilar escorted Chamberlain to D cube and ruthlessly beat him; Carlstrom initially asked for Chamberlain's paperwork, reported to Petrovich he did not have it, and later viciously stomped on him; Villafana authorized the Paisanos to participate in the taxing and brutally beat Chamberlain; and Guillen willfully kicked and hit Chamberlain multiple times. Thus, there was overwhelming evidence each of the appellants either committed or aided and abetted the commission of the target offenses.

*2. Second Degree Murder*

Aguilar claims there is insufficient evidence "any [inmates] engaged in conduct that rose to the level of second degree murder." Because each of the appellants join in the others arguments, we consider this claim as to each of them. Above, we explain how sufficient evidence supports each of the appellants' conviction for implied malice second degree murder. Thus, this claim is meritless.

*3. Natural and Probable Consequence*

Each appellant argues Chamberlain's death was not a natural and probable consequence of battery or assault with force likely to produce great bodily injury. They cite to the following to support their claims: deputies sanctioned CAR shot callers to control inmates and knew rule violations resulted in taxings; deputies should have stopped the taxing of Chamberlain; taxings were a regular occurrence; a taxing had never resulted in an inmate's death; two inmates who were present in F Barracks had been taxed and survived; and no weapons were used in Chamberlain's taxing. As we explain below, there was sufficient evidence for the jury to conclude a reasonable person in each of appellants' positions would have known Chamberlain's murder was the natural and probable consequences of the battery or assault with force likely to produce great bodily

67

injury.  (*Medina, supra,* 46 Cal.4th at p. 920 [reasonable foreseeability does not require strong possibility but instead a possible consequence].)

Before we address the objective knowledge of each appellant, we again briefly explain the surrounding circumstances of the CAR culture in TLJ.  Inmates despised child molesters, and the ground rules that applied to taxing generally did not apply to taxing child molesters.  All CARs could tax an inmate who was, or was believed to be, a child molester.  Petrovich, the Woods shot caller, said child molesters are among the most despised inmates in jail and there are no rules on taxing them.  Pursuant to Petrovich's authorization, Aguilar escorted Chamberlain to the blind spot in D cube.  Over the course of about 30 minutes, at least 30 and by some accounts 50 inmates brutally attacked Chamberlain.  They repeatedly hit him, kicked him, stomped on him, and did other abhorrent things to him.  When Chamberlain passed out, inmates threw water on him to wake him up and continued the ruthless beating.  Multiple witnesses saw Chamberlain writhing on the ground, crying for help, and trying to crawl under a bunk for safety.  Chamberlain's injuries were consistent with a violent death.  Only three of his 24 ribs were not broken and one of his broken ribs punctured his lung.  We will now discuss each appellant and his objective knowledge.

*a.  Petrovich*

A reasonable person in Petrovich's position would certainly know Chamberlain's taxing would not be a normal taxing.  The evidence established Petrovich authorized Chamberlain's taxing first by telling the South-Siders shot caller to "do whatever" and then telling other inmates Chamberlain was a child molester.  Petrovich told investigators there are no rules on taxing child molesters and "'They're wide open.'"  The jury could rely on this evidence, and the testimony of one witness who was present in D cube with Petrovich, to conclude Petrovich knew this was not going to be a normal taxing.  Corral testified Petrovich was present when the shot callers discussed raping Chamberlain and an incentive for any inmate who did so.  Petrovich's knowledge

Chamberlain would likely be raped negates his claim he could not possibly know the taxing would not spiral out of control. It is certainly reasonable to conclude that if an inmate is willing to rape another inmate for a few commissary items, there are no limits an inmate would go to. It was reasonably foreseeable an inmate would stomp on another inmate for the sheer pleasure of it.

Additionally, during his interview with Schou, Petrovich said that when he returned to his cube and told inmates about the taxing, "'[E]veryone just started getting pumped up. Let's get him. People were like, let's do this. Let's not wait until 8.'" The jury could reasonably rely on this evidence to conclude a reasonable person in Petrovich's position would know Chamberlain's death was the natural and probable consequences of the target offenses. Chamberlain was a suspected child molester, there are no rules concerning taxing child molesters, all the CARs were authorized to tax Chamberlain, the three shot callers discussed conduct that was abnormal to a typical taxing, and there were 146 inmates in F West, some of whom were chomping at the bit. Thus, there was sufficient evidence to conclude a reasonable person in Petrovich's position would know murder was a natural and probable consequence of battery and assault with force likely to produce great bodily injury within jail culture.

*b. Aguilar*

A reasonable person in Aguilar's position would know Chamberlain would be the recipient of a ruthless taxing. After Petrovich told Aguilar there was going to be a beating of a "Chester" who admitted he likes young children, Aguilar escorted Chamberlain to D cube and pushed Chamberlain to the ground. Again, the evidence established Aguilar alone could have killed Chamberlain. There was overwhelming evidence Aguilar ruthlessly hit, kicked, and stomped on Chamberlain. Aguilar hit Chamberlain so hard his hand hurt, despite the fact he put rubber soled shoes on his hands. Aguilar was present in D cube throughout the assault and threw water on Chamberlain to prolong the beating. It defies logic to argue this began "as a

69

run-of-the-mill taxing." Aguilar ends his argument by asserting, "If one could not reasonably foresee the mob-like circumstances that fostered the murder (assuming one occurred), then one could not foresee the murder itself."

We need not "assume" a murder occurred as the record includes strong evidence one did occur. And the record includes evidence one *could* reasonably foresee the "mob-like circumstances that fostered the murder." Again, witnesses testified Aguilar ruthlessly beat Chamberlain and apprised Petrovich of the progress of the taxing. The jury could reasonably rely on this evidence to conclude Aguilar instigated the "mob-like circumstances" with his ruthless conduct and he condoned it by not doing something to stop it when he knew "'it got out of hand.'" Therefore, there was sufficient evidence to conclude a reasonable person in Aguilar's position would know murder was a natural and probable consequence of battery and assault with force likely to produce great bodily injury in F West.

c. *Carlstrom*

A reasonable person in Carlstrom's position would know Chamberlain would not be subjected to a normal taxing. Based on Carlstrom's position as the Woods' mouse and the fact Chamberlain failed to provide Carlstrom with his paperwork, it was reasonable for the jury to conclude Carlstrom knew Chamberlain was going to be taxed. Carlstrom's claim a reasonable person in his position would know only that Chamberlain was going to be subjected to a normal taxing is belied by his conduct. Carlstrom told investigators, "[e]verybody had a chance to have a turn" hitting and kicking Chamberlain. By his own admission, by the time Carlstrom entered D cube, Chamberlain was already "messed up." That did not deter Carlstrom, however, as he forcefully kicked Chamberlain and grabbed onto the bunk for leverage and stomped on Chamberlain. Moreover, Carlstrom helped prolong the attack. The natural and probable consequences of Carlstrom providing water to Aguilar and another inmate to revive Chamberlain so inmates could beat him more was to increase the likelihood Chamberlain would suffer

70

life threatening injuries. The jury could rely on this evidence to conclude that when faced with the choice of ending the assault or prolonging it, Carlstrom chose to prolong it. Thus, there was sufficient evidence to conclude a reasonable person in Carlstrom's position would know murder was a natural and probable consequence of battery and assault with force likely to produce great bodily injury in TLJ.

d. *Villafana*

A reasonable person in Villafana's position would know Chamberlain would be the recipient of a violent taxing. Villafana was the Paisanos shot caller and was present in D cube when he and the other two shot callers discussed beating and raping Chamberlain. Again, based on the CAR culture, the jury could reasonably conclude Villafana authorized the Paisanos to participate in the taxing and knew it was not going to be a normal taxing because of the nature of Chamberlain's charges. Additionally, Villafana's conduct contradicts his claim a reasonable person in his position would expect to participate in a normal taxing. The evidence established he hit Chamberlain twice with a closed fist and he kicked Chamberlain on his head and torso. Finally, Villafana essentially supervised the attack by going back and forth between working out in E cube and watching Chamberlain's assault in D cube. A reasonable person in Villafana's position could not possibly believe this was a normal taxing. Therefore, there was sufficient evidence to conclude a reasonable person in Villafana's position would know murder was a natural and probable consequence of battery and assault with force likely to produce great bodily injury.

e. *Guillen*

A reasonable person in Guillen's position too would know Chamberlain would not be subjected to a normal taxing. Guillen repeatedly told investigators he knew Chamberlain was going to be taxed because he was a child molester. Guillen told investigators all Mexicans had to participate in the taxing and admitted he wanted to hit Chamberlain when he thought about someone molesting his young daughters. Before

71

Guillen entered D cube, he saw a lot of people hitting Chamberlain.  It is beyond dispute Guillen kicked Chamberlain one time and hit him three times on the stomach with a shoe.  When Guillen hit Chamberlain, Chamberlain was on his side, moving and screaming.  Guillen was familiar with the general rules of taxing, but stated those rules do not apply to child molesters because everyone participates in the taxing.  Based on all this evidence, the jury could reasonably conclude a reasonable person in Guillen's position would know this was not a garden variety taxing but instead a beating that involved many inmates in F West.  Therefore, there was sufficient evidence to conclude a reasonable person in Guillen's position would know murder was a natural and probable consequence of battery and assault with force likely to produce great bodily injury.  Thus, sufficient evidence supported the conclusion each appellant was guilty of second degree murder under the natural and probable consequences doctrine.

## D.  Conspiracy

"The law has been settled for more than a century that each member of a conspiracy is criminally responsible for the acts of fellow conspirators committed in furtherance of, and which follow as a natural and probable consequence of, the conspiracy, even though such acts were not intended by the conspirators as a part of their common unlawful design. [Citations.]  [¶]  Recognizing that criminal agency poses a greater threat to society than that posed by an independent criminal actor, the law 'seeks to deter criminal combination by recognizing the act of one as the act of all.'  [Citations.] 'In combining to plan a crime, each conspirator risks liability for conspiracy as well as the substantive offense; in "planning poorly," each risks additional liability for the unanticipated, yet reasonably foreseeable consequences of the conspiratorial acts, liability which is avoidable by disavowing or abandoning the conspiracy.'  [Citation.]  [¶]  The question whether an unplanned crime is a natural and probable consequence of a conspiracy to commit the intended crime 'is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, [the unplanned crime] was

72

*reasonably* foreseeable.' [Citation.] To be reasonably foreseeable '''''[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. . . .' [Citation.]''' [Citation.] Whether the unplanned act was a 'reasonably foreseeable consequence' of the conspiracy must be 'evaluated under all the factual circumstances of the individual case' and 'is a factual issue to be resolved by the jury' [citation], whose determination is conclusive if supported by substantial evidence. [Citations.]" (*People v. Zielesch* (2009) 179 Cal.App.4th 731, 739-740 (*Zielesch*).)

Here, each appellant agrees that liability as a conspirator is based on the same analysis as that under the natural and probable consequences doctrine of aiding and abetting. (*People v. Prieto* (2003) 30 Cal.4th 226, 249-250 (*Prieto*); *Prettyman, supra,* 14 Cal.4th at pp. 260-261; *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5.) Appellants argue the same evidentiary flaws inherent in the natural and probable consequences doctrine of aiding and abetting theory of liability are also inherent in the conspiracy theory of liability. We have addressed those claims above in greater detail and need not address them again. Suffice it to say, the record includes sufficient evidence from which the jury could reasonably conclude a reasonable person in each appellant's position would know Chamberlain was not subjected to a normal taxing because he was a suspected child molester and his death was the natural and probable consequence of the battery or assault with force likely to cause great bodily injury.

That does not end our inquiry, however, as Aguilar raises two additional claims, and his co-appellants join those claims. First, appellants argue a conspirator is not liable for acts not in furtherance of the conspiracy. Second, they contend not all the inmates who participated in the assault were members of the conspiracy and they cannot be liable for the acts of non-conspirators.

73

*1. Furtherance of the Conspiracy*

Relying on the principle "a conspirator may be vicariously liable for a crime committed in furtherance of a conspiracy" (*Prieto, supra,* 30 Cal.4th at pp. 249-250; *People v. Hardy* (1992) 2 Cal.4th 86, 188-189), appellants argue the conspiracy ended when Aguilar and Petrovich "struck [Chamberlain] repeatedly" and the second degree murder was not in furtherance of the conspiracy. Appellants claim they are not liable for "[t]he beating that followed in waves over the next 30 minutes . . . ." They rely on *People v. Zamora* (1976) 18 Cal.3d 538 (*Zamora*), and *People v. Leach* (1975) 15 Cal.3d 419 (*Leach*), to support their claim acts to avoid detection and punishment committed after accomplishment of the criminal objective are not committed in furtherance of the conspiracy.

We agree "a conspirator may be vicariously liable for a crime committed in furtherance of a conspiracy only if that crime was a natural and probable consequence of the conspiracy" (*Prieto, supra,* 30 Cal.4th at pp. 249-250) and "that acts committed by conspirators subsequent to the completion of the crime which is the primary object of a conspiracy cannot be deemed to be overt acts in furtherance of that conspiracy." (*Zamora, supra,* 18 Cal.3d at p. 560; *Leach, supra,* 15 Cal.3d at p. 431.) But the crime, murder, was the natural and probable consequence of the conspiracy, and the crime was not complete until Aguilar alerted deputies.

The conspiracy's purpose was for all three CARs to commit a battery or assault with force likely to produce great bodily injury. The evidence establishes Petrovich, the Woods shot caller, met with Villafana, the Paisanos shot caller, and "Stretch," the South-Siders shot caller and agreed to beat and rape Chamberlain because he was a child molester. The evidence demonstrated that normal taxing rules did not apply to child molesters and all the CARs could participate in the taxing, which was "'wide open.'" After Aguilar escorted Chamberlain to D cube, Petrovich hit Chamberlain and Aguilar ruthlessly attacked him. Carlstrom's and Guillen's statements

74

to investigators establish their conduct was in furtherance of the conspiracy because they willingly participated in a CAR sanctioned taxing of an inmate the CAR leadership believed to be a child molester. Carlstrom kicked a defenseless and severely injured Chamberlain and then stomped on him. Guillen kicked and hit Chamberlain. Villafana hit Chamberlain twice with a closed fist and kicked him on his head and torso. Carlstrom's, Guillen's, and Villafana's assaults with force likely to produce great bodily injury were all in furtherance of the conspiracy to tax Chamberlain, a person they believed was a child molester.

Additionally, Petrovich, Aguilar, and Villafana ensured the taxing continued. The evidence established Villafana made repeated trips from working out in E cube to D cube to monitor the taxing. The evidence also demonstrated Aguilar's participation extended past the beginning of the assault—he threw water on Chamberlain to revive him so inmates could continue to beat him and he went from D cube to speak with Petrovich and then returned to D cube throughout the assault. Petrovich disputes Aguilar was providing him with updates when Aguilar left D cube, spoke with him, and returned to D cube. Petrovich states, "Perhaps Aguilar was giving [him] Pinochle advice." It is true Corral testified he could not hear what they discussed. However, the jury could reasonably conclude that because Aguilar returned to D cube after speaking with Petrovich, they discussed the taxing, not cards. Moreover, Petrovich's appellate counsel's attempt at humor is sorely misplaced. During the taxing, Petrovich told an inmate not to look into D cube and to "keep walking." Does appellate counsel suggest Petrovich was simply encouraging the inmate to maintain a regular exercise regiment? Or is the more likely explanation Petrovich sought to minimize the number of witnesses who could implicate the responsible inmates? We think the latter.

This evidence demonstrates Petrovich, Aguilar, and Villafana knew the purpose of the conspiracy continued past the first wave of the attack. Based on a complete reading of the record, it was reasonable for the jury to conclude the conspiracy

75

ended only when Aguilar stood on the table to get the deputies' attention and each appellant furthered the conspiracy by attacking and/or prolonging the purpose of the conspiracy.

*2. Members of the Conspiracy*

Appellants argue they are not liable as conspirators for second degree murder because the evidence does not establish all the inmates who struck Chamberlain were members of the conspiracy. We disagree.

It is true a conspirator is not responsible for the acts of a non-conspirator even if the acts helped further the conspiracy. (*Zielesch, supra,* 179 Cal.App.4th at p. 739.) "'Although the existence of the conspiracy must be shown by independent proof [citation], the showing need only be prima facie evidence of the conspiracy. [Citation.] The prima facie showing may be circumstantial [citation], and may be by means of any competent evidence which tends to show that a conspiracy existed. [Citation.]' [Citation.] . . . [Citations.] [¶] . . . [¶] Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1134-1135 (*Rodrigues*); *People v. Johnson* (2013) 57 Cal.4th 250, 264.)

We need not recount how each appellant conspired to tax Chamberlain and either commit a battery or assault with force likely to produce great bodily injury the natural consequences of which was Chamberlain's death. Petrovich, Aguilar, and Villafana each played a role in ensuring F West was on notice Chamberlain was going to be taxed. And there was evidence each appellant hit, kicked, and/or stomped on Chamberlain. Petrovich, Aguilar, and Villafana monitored and/or prolonged the vicious

76

attack. Thus, the record includes evidence from which the jury could conclude each appellant intended to, agreed to, and acted to further the conspiracy.

Appellants' complaint though is they should not be held liable for the acts of other unidentified inmates who assaulted Chamberlain and may have inflicted the fatal blow because they were not part of the conspiracy. To the contrary, there is substantial evidence the unnamed inmates involved in Chamberlain's beating were also part of the conspiracy to commit battery or assault with force likely to produce great bodily injury.

"It is, of course, unnecessary that each conspirator see the others or know who all the members of the conspiracy are." (*People v. Buffum* (1953) 40 Cal.2d 709, 725, overruled on another ground in *People v. Morante* (1999) 20 Cal.4th 403, 430.) The conspiracy's objective was to tax Chamberlain because the CAR leadership believed he was a child molester. Inmates were prohibited from taxing other inmates unless the CAR management sanctioned the taxing, and the CARs looked favorably upon inmates taxing child molesters. The shot callers authorized the taxing of Chamberlain and encouraged all inmates to participate by offering an incentive to anyone who raped Chamberlain. Inmates throughout F West heard Chamberlain was a child molester and he was going to be taxed.

The jury could reasonably rely on this evidence to conclude each of the inmates that hit, kicked, or stomped on Chamberlain and contributed to his injuries committed a battery or assault that furthered the conspiracy's objective. Additionally, the jury could reasonably infer the unidentified inmates participated in the assault knowing it was in furtherance of the CARs' sanctioned taxing. Therefore, the other inmates that joined the assault and contributed to Chamberlain's injuries were also coconspirators and appellants are responsible for their acts in furtherance of the conspiracy to commit battery or assault with force likely to cause great bodily injury. There was sufficient evidence to convict each appellant of second degree murder under the theories of conspiracy, aiding

77

and abetting-natural and probable consequences doctrine, and malice aforethought—implied malice.

II. *Motion to Dismiss for Outrageous Government Conduct*

Petrovich argues the trial court erred in denying his motion to dismiss for outrageous government conduct in violation of the Fourteenth Amendment due process clause. All co-appellants join Petrovich's argument. In his opening brief, Petrovich invited this court to read the DA Report before considering appellants' claims. We have done so. The DA Report can be found at the OCDA's Web site at the following address: <http://www.orangecountyda.com/docs/chamberlain_report.pdf> [as of July 7, 2014]. As we explain below, we conclude the court properly denied appellants' motion to dismiss because the government's conduct was not so outrageous to warrant dismissal.

A. *Legal Principles*

1. *Federal Case Authority*

A court's power to dismiss a criminal case for outrageous government conduct arises from the due process clause of the United States Constitution. (*Rochin v. California* (1952) 342 U.S. 165 (*Rochin*).) In that case, three deputy sheriffs entered defendant's residence without a warrant, and when they saw defendant grab two capsules from his night stand and put them in his mouth, they jumped on defendant and attempted to retrieve the capsules. (*Id*. at p. 166.) When they were unsuccessful, they forcibly took defendant to the hospital and had his stomach pumped against his will. (*Ibid*.) The Court reversed the conviction, opining the capsules, which constituted the "chief evidence against" defendant, were "obtained by methods that offend the Due Process Clause." (*Id*. at pp. 166, 174.) The Court explained, "[T]he proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combating crime too energetically. This is conduct that shocks the conscience." *Id*. at p. 172.) The Court stated the government's conduct was "bound to offend even hardened sensibilities." (*Ibid*.)

78

Three years later, the United States Supreme Court stated it set aside the conviction in *Rochin* because the "conduct 'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency." (*Breithaupt v. Abram* (1957) 352 U.S. 432, 435.)

Years later, the Supreme Court reaffirmed, in dicta, outrageous government conduct may require reversal of a criminal conviction in *United States v. Russell* (1973) 411 U.S. 423 (*Russell*). In discussing the entrapment defense, the Court noted "the principal element in the defense of entrapment was the defendant's predisposition to commit the crime." (*Id*. at p. 433.) Citing *Rochin*, the Court acknowledged the possibility a defendant might make a successful claim of outrageous police conduct defense in an extreme case: "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . ." (*Russell, supra,* 411 U.S. at pp. 431-432.) The Court concluded, however, that case was "not of that breed" because the government's conduct fell short of "violating that 'fundamental fairness, shocking to the universal sense of justice[.]'" (*Ibid*.)

Three years later, the Court revisited the issue in *Hampton v. United States* (1976) 425 U.S. 484 (*Hampton*). In that case, the Court rejected a due process claim based on outrageous government conduct when a government informant assisted defendant in two heroin sales. Recognizing the government's involvement was greater than the agent in *Russell*, the Court nonetheless concluded, "But in each case the [g]overnment agents were acting in concert with the defendant, and in each case either the jury found or the defendant conceded that he was predisposed to commit the crime for which he was convicted." (*Hampton, supra,* 425 U.S. at pp. 489-490.) The Court concluded: "The limitations of the Due Process Clause of the Fifth Amendment come into play only when the [g]overnment activity in question violates some protected right of

79

the *defendant*. Here, as we have noted, the police, the [g]overnment informant, and the defendant acted in concert with one another. If the result of the governmental activity is to 'implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission . . . ,' [citation], the defendant is protected by the defense of entrapment. If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law. [Citations.]" (*Id.* at pp. 490-491.)

In *U.S. v. Williams* (9th Cir. 2008) 547 F.3d 1187, 1199-1200 (*Williams*), the Ninth Circuit Courts of Appeals stated there are "five factors that, when satisfied, *indicate* that the governmental conduct was acceptable. The five factors are: (1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in process at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity." (Italics added; see *U.S. v. Bonanno* (9th Cir. 1988) 852 F.2d 434, 437-438 (*Bonanno*); cf. *U.S. v. Black* (9th Cir. 2013) 733 F.3d 294, 304, fn. 7 (*Black*) [explaining *Bonanno* test not dispositive, has not been used consistently, and is "part of . . . consideration of all the circumstances as a whole"]; see *United States v. Bogart* (9th. Cir. 1986) 783 F.2d 1428, 1438 (*Bogart*) [outrageous government conduct claims must "[u]ltimately" be resolved based on a totality of the circumstances], vacated in part on other grounds in *United States v. Wingender* (9th Cir. 1986) 790 F.2d 802.)

Ninth Circuit Court of Appeals' cases have described what a high bar defendants who assert outrageous government conduct must overcome. The remedy is a "narrow one." (*United States v. Ryan* (9th Cir. 1976) 548 F.2d 782, 789.) "For a due

80

process dismissal, the [g]overnment's conduct must be so grossly shocking and so outrageous as to violate the universal sense of justice. [Citations.] The [g]overnment's involvement must be *malum in se* or amount to the engineering and direction of the criminal enterprise from start to finish. [Citation.] The police conduct must be 'repugnant to the American system of justice.' [Citations.] In short, a defendant must meet an extremely high standard." (*U.S. v. Smith* (9th Cir. 1991) 924 F.2d 889, 897 (*Smith*); *Black, supra,* 733 F.3d at p. 302 [explaining standard for outrageous government conduct "is an 'extremely high standard[]'" and noting "there are only two reported decisions in which federal appellate courts have reversed convictions under this doctrine"]; see *United States v. Twigg* (3d Cir. 1978) 588 F.2d 373; *Greene v. United States* (9th Cir. 1971) 454 F.2d 783 (*Greene*).) "*[P]assive tolerance . . .* [is] less egregious than the conscious direction of government agents typically present in outrageous conduct challenges." (*U.S. v. Simpson* (9th Cir. 1987) 813 F.2d 1462, 1468, italics added (*Simpson*).)

*2. California Case Authority*

In 1978, the California Supreme Court, in dicta, stated, "Sufficiently gross police misconduct could conceivably lead to a finding that conviction of the accused would violate his constitutional right to due process of the law. [Citation.]" (*People v. McIntire* (1979) 23 Cal.3d 742, 748, fn. 1 (*McIntire*).) The *McIntire* court relied not on *Rochin* but instead on a New York Court of Appeals case that cited to *Rochin, Russell,* and *Hampton.* (See *People v. Isaacson* (1978) 44 N.Y.2d 511, 520 [378 N.E.2d 78].)

The California Supreme Court revisited the issue in *People v. Smith* (2003) 31 Cal.4th 1207 (*Smith*). In that case, defendants believed they were stealing cocaine from the home of a major drug dealer but it was an undercover sting operation. A reliable informant and an undercover officer told defendant at various times the house contained 200 kilograms, 30 to 100 kilograms, and 85 kilograms of cocaine. (*Ibid.*) The

81

officers placed 85 kilograms of cocaine at the house before defendants attempted the crime. (*Id.* at p. 1213.) The trial court sentenced each defendant to an additional 25 years in prison because they attempted to transport more than 80 kilograms of cocaine. (*Id.* at p. 1214.) On appeal, defendants argued the trial court should have imposed the 15-year additional term applicable for more than 20 but less than 40 kilograms because the undercover officers manipulated them into agreeing to steal more than 80 kilograms. They relied on the doctrines of sentencing entrapment, sentencing manipulation, and outrageous government conduct. (*Ibid.*) After concluding the doctrine of sentencing entrapment is inapplicable in California and declining to decide if it should adopt the doctrine of sentencing manipulation (*Id.* at pp. 1216, 1218, 1221), the court addressed the issue of outrageous law enforcement misconduct. (*Id.* at p. 1223.)

The *Smith* court summarized prior federal and California cases that recognized the possibility government conduct could be so outrageous that due process would bar the government from seeking a conviction. (*Smith, supra,* 31 Cal.4th at pp. 1223-1224, citing *Hampton, supra,* 425 U.S. 484; *Russell, supra,* 411 U.S. 423; *Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561; *McIntire, supra,* 23 Cal.3d 742.) The *Smith* court acknowledged this court, in *People v. Thoi* (1989) 213 Cal.App.3d 689 (*Thoi*), previously concluded the outrageous conduct defense is "superfluous" in entrapment cases. (*Smith, supra,* 31 Cal.4th at p. 1225.) The *Smith* court noted, however, the court in *People v. Holloway* (1996) 47 Cal.App.4th 1757, 1767-1768 (*Holloway*), overruled on another ground in *People v. Fuhrman* (1997) 16 Cal.4th 930, 947, fn. 11, disagreed with the *Thoi* court's analysis rejecting the outrageous government conduct defense in entrapment cases. (*Smith, supra,* 31 Cal.4th at p. 1225.) The *Smith* court explained the Court of Appeal in *Smith* relied on four factors articulated in *People v. Wesley* (1990) 224 Cal.App.3d 1130 (*Wesley*), in concluding the government's conduct was not outrageous. (*Smith, supra,* 31 Cal.4th at pp. 1225-1226.)

The *Smith* court stated the *Wesley* factors to be: "(1) whether the police manufactured a crime that otherwise would not likely have occurred, or merely involved themselves in an ongoing criminal activity; (2) whether the police themselves engaged in criminal or improper conduct repugnant to a sense of justice; (3) whether the defendant's reluctance to commit the crime is overcome by appeals to humanitarian instincts such as sympathy or past friendship, by temptation of exorbitant gain, or by persistent solicitation in the face of unwillingness; and (4) whether the record reveals simply a desire to obtain a conviction with no reading that the police motive is to prevent further crime or protect the populace." (*Smith, supra,* 31 Cal.4th at p. 1226.) The *Smith* court concluded that its facts showed unexceptionable conduct by law enforcement, so it was the wrong case to resolve conflicting decisions on whether the defense is available in California. (*Id.* at p. 1227.) In her concurrence joined by then Chief Justice George and Justice Kennard, Justice Werdegar opined, "The due process 'defense' of outrageous law enforcement conduct is actually a *bar to prosecution* rather than a defense to the charge; as such, it is properly raised by motion and decided by the court. [Citations.]" (*Id.* at p. 1227 (conc. opn. of Werdegar, J.).)

*3. Standard of Review*

"The determination of whether the government engaged in outrageous conduct in violation of the defendant's due process rights is a mixed question. The first step involves the consideration and weighing of the evidence and assessing the credibility of the witnesses to determine factually whether, and to what extent, governmental misconduct occurred. This factual determination is clearly one that is subject to a deferential standard of review. But the second step—whether the governmental conduct constitutes outrageous conduct in the constitutional sense of violating the defendant's due process rights—involves the application of law to the established facts and is primarily a legal question. The rights of the respective parties here are extremely important ones, namely, defendant's right to a fair trial and the People's right to prosecute persons

83

believed to be responsible for the commission of serious crimes." (*People v. Uribe* (2011) 199 Cal.App.4th 836, 857-858 (*Uribe*) [discussing uncertainty of applicable standard due to dearth of authority]; cf. *People v. Carmony* (2004) 33 Cal.4th 367, 375 [ruling on request for dismissal in the interests of justice pursuant to § 1385 is reviewed for abuse of discretion].)

*B. Analysis*

*1. Protected Right*

In *Hampton, supra,* 425 U.S. at page 490, the Supreme Court of the United States explained Fifth Amendment due process rights are implicated when the government violates a "protected right of the *defendant*." As we explain below, the protected rights appellants asserted below, and assert again on appeal, are not sufficiently similar to those protected rights California courts and Ninth Circuit Courts of Appeals have recognized as implicating due process concerns. We recognize we are not bound by decisions of the Ninth Circuit Court of Appeals. (*Uribe, supra,* 199 Cal.App.4th at p. 875.) However, because of the unsettled state of the viability of the outrageous government conduct doctrine in California and because of the persuasive nature of federal court of appeal decisions, we look to those decisions for guidance as well.

Those cases where California courts have concluded dismissal is required for outrageous government conduct all involve situations where the government violated a fundamental right of the defendant, the attorney-client relationship, and prevented them from receiving a fair trial. (*Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252, 1260 [dismissal required where prosecutor's use of investigator to intercept confidential communications between defendant and attorney shocked the conscience]; *Boulas v. Superior Court* (1986) 188 Cal.App.3d 422, 429 [dismissal required where prosecutor's and sheriff's conduct outrageous in extreme and violated defendant's right to effective assistance of counsel at a critical stage of the proceeding where they offered deal if

84

defendant fired attorney and hired "acceptable" attorney, defendant continued to assist with investigation, and district attorney withdrew deal]; *People v. Moore* (1976) 57 Cal.App.3d 437, 440-442 [dismissal required where government interfered with attorney-client relationship when prosecutor told defendant not to tell defense counsel about agreement to assist in investigation and investigator disparaged defense counsel and falsely said counsel had been disbarred].)  And the Ninth Circuit Court of Appeals case where the court concluded dismissal was required concerned a situation where "the [g]overnment's conduct rise[d] to a level of 'creative activity' [citation]." (*Greene, supra,* 454 F.2d at pp. 786-787 [dismissal required where government contacted defendants who had been arrested for bootlegging, offered to supply necessary personnel, equipment, and ingredients, and participated in operation for nearly three years].)

Cases where California and Ninth Circuit Courts of Appeals courts have concluded the government did not commit outrageous conduct warranting dismissal involved situations where a potentially independent right was implicated but the defendant was not denied the right to a fair trial.  (*In re Martin* (1987) 44 Cal.3d 1, 54-56 [serious prosecutorial misconduct was not outrageous government misconduct warranting dismissal because defendant's ability to present a defense was not undermined]; *Uribe, supra,* 199 Cal.App.4th at p. 869 [prosecutor's misconduct by testifying untruthfully did not violate defendant's constitutional right to effective cross-examination and thus did not warrant dismissal for outrageous government conduct].)  One Ninth Circuit case involved a situation where the government played a role in the unlawful activity but did not engineer the crime from start to finish.  (*Black, supra,* 733 F.3d at p. 310 [ATF agent's use of confidential informant to recruit defendants to commit armed robbery of fictional drug stash house not "'grossly shocking and . . . outrageous'" because government did not engineer crime from start to finish].)

The majority of the California and Ninth Circuit cases finding no outrageous government activity involve situations where the defendant initiated the

85

unlawful activity directly or government participated in *ongoing* criminal activity. (*Holloway, supra,* 47 Cal.App.4th at pp. 1767-1768 [disagreeing with *Thoi*; holding outrageous government conduct defense exists in entrapment cases where during drug sting operation police targeted no specific persons and defendant approached undercover officers posing as drug buyers and sellers seeking to purchase drugs but not applicable because defense cannot be asserted vicariously]; *People v. West* (1990) 224 Cal.App.3d 1337, 1346-1347 [police conduct in reverse sting operation using cocaine seized in other cases where defendant approached officer and requested to buy drugs was not outrageous police conduct constituting due process violation]; *Wesley, supra,* 224 Cal.App.3d at pp. 1144-1145 [no outrageous government conduct where undercover police officer stood in front of house with narcotics cocaine visible on ground and defendant approached and initiated drug buy]; *Thoi, supra,* 213 Cal.App.3d at pp. 692-693, 697 [assuming doctrine viable when government's use of undercover agents as carriers to combat Medi-Cal fraud was not outrageous conduct because government did not foster, encourage, or condone fraud]; *People v. Harris* (1985) 165 Cal.App.3d 324, 332 [police use of informants in chain of drug arrests did not establish outrageous conduct because police only participated in ongoing criminal activity]; *People v. Peppars* (1983) 140 Cal.App.3d 677, 686-687 [undercover officer's involvement in planning stages of burglary not outrageous government conduct because defendant suggested unlawful activity]; *Williams, supra,* 547 F.3d at pp. 1199-1201 [government's decision to stage stash house robbery to arrest defendants for drug and robbery offenses did not constitute outrageous government conduct because all *Bonanno* factors satisfied]; *United States v. Gurolla* (9th Cir. 2003) 333 F.3d 944, 950-951 (*Gurolla*) [federal sting operation targeting money laundering where government knew target banks were involved in money laundering did not constitute outrageous government conduct because government did not initiate criminal activity]; *United States v. Hugs* (9th Cir. 1997) 109 F.3d 1375, 1378-1379 [undercover agent's conduct of unlawfully killing game out of season and on reservation and

86

unlawfully bringing alcoholic beverages onto reservation did not constitute outrageous government conduct where agent did not precipitate defendant's criminal activity]; *United States v. Barrera–Moreno* (9th Cir. 1991) 951 F.2d 1089, 1092 [government's failure to monitor private informant's use of cocaine not outrageous government conduct because government did not direct conduct but instead *passively tolerated* it]; *Smith, supra,* 924 F.2d at p. 897 [government's use of undercover agent to encourage 18-year-old patient in drug rehabilitation center to deal drugs "not the most constructive enforcement method" but was not outrageous government conduct because defendant showed an independent tendency for dealing drugs]; *Bonanno, supra,* 852 F.2d at pp. 437-438 [FBI informant posing as potential investor in fraudulent scheme did not constitute outrageous government conduct because government did not engineer and direct the fraudulent plan]; *Simpson, supra,* 813 F.2d at p. 1467 [FBI's use of confidential informant to investigate suspected narcotics dealer and who became sexually intimate with defendant was not outrageous government conduct because government did nothing to encourage confidential informant's use of sex].)

As they did below, appellants assert there were a number of protected rights implicated by the OCSD's and OCDA's conduct. They assert the following: (1) OCSD deputies were derelict in their duties to protect inmates and empowered inmates through the use of the CAR system; (2) OCSD violated protocol and investigated itself creating a conflict of interest; (3) OCSD conducted a biased investigation as evidenced by lost evidence, perjured testimony, and multiple violations of Grand Jury rules; (4) Taylor and Petrovich were equally culpable, and OCDA did not prosecute any deputies; and (5) dismissal of the case would have "sen[t] a message" to OCSD. None of these are sufficient to establish the OCSD or the OCDA violated a protected right of the appellants.

We begin by acknowledging appellants' point the DA Report demonstrates OCSD deputies in TLJ engaged in abhorrent conduct and were derelict in their duties. And we recognize that because of the extreme nature of their conduct, which violated the

public trust and the spirit of what we expect from those we entrust to enforce the law, it is unreasonable, nay impossible, to find a case analogous to the case we have before us. Nevertheless, we conclude the cases we discuss above establish appellants have not established that the OCSD or the OCDA engaged in outrageous government conduct that impacted a protected right and prevented them from receiving a fair trial.

The cases where courts have concluded the government's conduct barred prosecution because it was outrageous have involved situations where the government interfered with a defendant's right to effective assistance of counsel or created, encouraged, and condoned lengthy unlawful activity. That is not the situation we have here. Neither OCSD nor OCDA interfered with appellants' right to effective assistance of counsel or any other constitutional right preventing them from receiving a fair trial. Additionally, OCSD did not create the CAR system. The CAR system is an inmate-generated phenomenon that started in the 1950s. Although at least some OCSD deputies condoned and/or utilized the CAR system, OCSD deputies' conduct was not outrageous government conduct sufficient to warrant dismissal. It was more akin to those cases where the defendant initiated the unlawful activity and the government participated in or allowed the ongoing criminal activity.

Appellants make a related claim the OCSD's deputies' manner in operating TLJ violated their Eighth Amendment rights. The pages of the reporter's volume Petrovich cites do not support the conclusion appellants raised an Eighth Amendment claim. Garten's motion mentioned the Fifth and Sixth Amendments, not the Eighth Amendment. And neither Petrovich nor Guillen mentioned the Eighth Amendment in their joinders. Finally, Petrovich does not include any case authority to support the claim. This claim is forfeited. (*People v. Gamache* (2010) 48 Cal.4th 347, 403; *People v. Wallace* (2008) 44 Cal.4th 1032, 1096.)

Additionally, the fact OCSD investigated itself did not implicate a protected right preventing appellants from receiving a fair trial. (*United States v. Wiley*

88

(9th Cir. 1986) 794 F.2d 514, 515 [negligence or poor judgment does not establish outrageous conduct].)  The overarching theme of this contention, and frankly appellants' third and fourth claims, is that by OCSD investigating itself, they minimized Taylor's, Chapluk's, and Le's involvement in Chamberlain's death.  But this does not exonerate appellants.  As the Supreme Court of the United States said in *Hampton, supra,* 425 U.S. at pages 490-491, "If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law.  [Citations.]"  A truly independent investigation may have implicated Taylor, Chapluk, and Le, but it would not have exonerated appellants.  Additionally, it is within the prosecutor's sole discretion who to charge.  (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 451.)

We need not explain again there was sufficient evidence, either by appellants' admissions or by other inmate testimony, establishing each appellant assaulted Chamberlain.  Appellants' suggestion the inmates' version of what happened would have been different had OCDA investigated Chamberlain's death is too speculative to establish OCSD's conflict of interest in investigating itself violated a protected right of the appellants.  Petrovich's claim another agency leading the investigation may have offered him a deal in exchange for his testimony against deputies is also too speculative.  We doubt OCDA would have offered the Woods shot caller and the person who authorized the taxing in the first instance a deal.  Finally, appellants' last claim, the trial court should have sent OCSD a message is not a proper grounds for dismissing a criminal case.  We now turn briefly to the tests articulated by the California courts and Ninth Circuit Courts of Appeals.

*2. California Test*

*a. Whether OCSD Manufactured Crime that would not have Occurred*

The record establishes inmates manufactured the crime and OCSD deputies allowed it to continue. The CAR system is an inmate-generated hierarchy that has existed for over half a decade in jails such as TLJ. The CAR shot caller and right-hand man determine which inmates were disciplined or taxed for breaking prison and inmate rules. Although there are limits concerning regular taxing (how long, where, and by whom an inmate can be hit), those rules do not apply to inmates who are believed to be child molesters. Inmates regularly learn an inmate's charges with the help of a third party who obtains the information via public information resources. The evidence at trial demonstrated Carlstrom tried to learn of Chamberlain's charges before Taylor spoke with Petrovich. The evidence also established the entire F West population could participate in Chamberlain's taxing because child molesters are the most despised inmates in jail. Deeply rooted jail culture and Taylor's conduct and statements before and after the incident are sufficient evidence OCSD deputies allowed the taxing but they do not establish they manufactured it.

*b. Whether OCSD Deputies Engaged in Criminal or Improper Conduct*

There is certainly sufficient evidence, in the evidence presented at trial and in the DA Report that was not admitted into evidence, to establish OCSD deputies engaged in improper conduct and were derelict in their duties. The issues raised in this case do not permit us to determine whether Taylor, Chapluk, or Le, or other OCSD personnel, could have been criminally prosecuted.

*c. Whether OCSD Overcame Appellants' Reluctance to Commit Crime*

There is no evidence OCSD deputies overcame appellants' reluctance to commit the assault. As we explain above in greater detail, inmates were going to tax Chamberlain because they believed he was a child molester. And sufficient evidence supports the conclusion each appellant willingly participated in the assault. The record is

90

void of any evidence any of the appellants were reluctant to commit the assault. That Taylor offered an incentive does not by itself establish appellants were reluctant to assault Chamberlain.

*d. Whether OCSD Desired Conviction Rather than Prevent Crime or Protect Populace*

This factor has no application to the facts of this case.

On balance, we conclude appellants have not established OCSD deputies engaged in outrageous government conduct that prevented appellants from receiving a fair trial. Appellants have not identified a protected right implicated by OCSD deputies as contemplated by California and Ninth Circuit case authority. Additionally, although OCSD deputies' conduct was morally reprehensible, they did not manufacture the assault on Chamberlain or overcome inmates' reluctance to commit the assault. OCSD deputies allowed the violent and horrifying beating of a suspected child molester, which was rooted in decades old jail culture. Thus, appellants have failed to satisfy the extremely high standard establishing outrageous government conduct sufficient to bar prosecution.

*3. Ninth Circuit "Test"*

We would reach the same conclusion based on the factors the Ninth Circuit Courts of Appeals have utilized in assessing claims of outrageous government conduct and based on a totality of the circumstances. (*Black, supra,* 733 F.3d at p. 304, fn. 7; *Williams, supra,* 547 F.3d at pp. 1199-1200; *Bonanno, supra,* 852 F.2d at pp. 437-438; *Bogart, supra,* 783 F.2d at p. 1438.)

*a. Whether Appellants Involved in or Engaged in Criminal Enterprise*

As we explain above, inmates initiated and carried out the taxing in accordance with well-established jail culture while OCSD deputies sat idly by and allowed it to continue.

*b. Whether OCSD Deputies' Assistance Necessary for Appellants' Criminal Enterprise*

We recognize this factor is somewhat problematic. OCSD deputies' participation was not necessary for inmates to assault Chamberlain. There is certainly

evidence though to support the conclusion OCSD deputies' participation, or rather their lack of participation, enabled the inmates to *continue* the attack. But there is also evidence that during day room, F Barracks was loud and chaotic, and the sound in the guard station was somewhat muted. While that would certainly excuse an *attentive* deputy from hearing the attack, it would not excuse an *attentive* deputy from looking out of the guard station and seeing all of the activity in D cube. Inmates were going to tax Chamberlain, but the deputies allowed it to continue.

*c. Whether OCSD Deputies Used Artifice and Stratagem to Ferret Out Criminal Activity*

This factor has no application to the facts of this case.

*d. Whether OCSD Deputies Infiltrated a Criminal Organization*

This factor has no application to the facts of this case.

*e. Whether OCSD Deputies Approached Appellants Contemplating Criminal Activity*

The last element supports our ultimate conclusion OCSD deputies did not engage in outrageous government conduct that prevented appellants from receiving a fair trial. The record includes evidence Taylor approached Petrovich, the Woods shot caller, who was already contemplating the assault based on Chamberlain's failure to produce his paperwork to the Woods mouse.

Again on balance, we conclude appellants have failed to satisfy the extremely high standard establishing outrageous government conduct because they have failed to identify a protected right implicated by OCSD deputies. Additionally, the fact OCSD deputies allowed an inmate manufactured assault does not establish outrageous government conduct barring prosecution, as contemplated by California and Ninth Circuit case authority. (*Gurolla, supra,* 333 F.3d at p. 950 [not citing or employing the *Bonanno* factors instead rejecting defendants' outrageous government conduct claim based solely on fact government did not initiate criminal activity].) Thus, the trial court properly denied appellants' motion to dismiss for outrageous government conduct.

*III. Evidentiary Issues*

Appellants argue there were numerous evidentiary errors. We will address each in turn.

*A. Chamberlain's State of Mind*

Carlstrom, and by virtue of their joinder all co-appellants, argue the trial court erred in admitting Chamberlain's statements to Palacios and Chapluk. Appellants assert Chamberlain's state of mind was not relevant because it was not at issue, it was relevant only if considered for its truth, it improperly bolstered the deputies' credibility, the statements were untrustworthy, and its admission was unduly prejudicial and violated their Sixth Amendment confrontation rights. We agree Chamberlain's state of mind was not relevant, but we conclude the error was not prejudicial.

It is true a trial court has broad discretion in admitting or excluding evidence, and we cannot conclude the court erred unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that results in a miscarriage of justice. (*People v. Streeter* (2012) 54 Cal.4th 205, 238 (*Streeter*) [because trial court properly admitted evidence California Supreme Court rejected defendant's constitutional claims].) Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) A victim's state of mind and conduct can be relevant to rebut the defense's theory of the case. (*People v. Crew* (2003) 31 Cal.4th 822, 836.) But to be relevant, the victim's state of mind must have a """"tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."""" (*People v. Riccardi* (2012) 54 Cal.4th 758, 814-815 (*Riccardi*).)

Here, the defenses' theory was that Taylor facilitated Chamberlain's taxing when he told Petrovich there was a child molester in J7 and instructed him to assault Chamberlain. The defense asserted Chamberlain was supposed to have a normal taxing but the deputies' dereliction of duties resulted in Chamberlain's death. The defense

posited Taylor's complicity in the taxing was relevant to the mental states necessary for murder. The Attorney General argues Chamberlain's alleged statements tend to undermine Taylor's alleged involvement because they show inmates tried to learn why Chamberlain was in custody before Taylor returned to work. We disagree.

We recognize the trial court went to great pains to address the relevancy of Chamberlain's statements and how they were at issue. On at least three occasions, the court asked the prosecutor to articulate its theory why Chamberlain's statements were relevant. Ultimately, the court reasoned Chamberlain's statement to Palacios could not be viewed in isolation from Chamberlain's statement to Chapluk. The court concluded the statements must be viewed together to properly determine whether Chamberlain's state of mind was relevant and at issue. Ultimately, the court concluded that as the "gatekeeper," Chamberlain's statements were relevant and at issue because they were relevant to the issue of whether Taylor played any role in the assault, which would eventually be at issue in trial. But we conclude Chamberlain's statements do not have any tendency to prove or disprove whether Taylor facilitated the attack.

Chamberlain's statement to Palacios before the day he was assaulted had no relevance to the issue of whether Taylor was involved. It may have demonstrated Chamberlain was afraid of the inmates, but it does not implicate Taylor. Chamberlain's statements to Chapluk similarly are not relevant to whether Taylor facilitated the taxing of Chamberlain. The Attorney General claims Chamberlain's meeting with and statements to Chapluk and Taylor "undermined the defense allegation that . . . Taylor met with Petrovich the day of Chamberlain's murder." The fact Chamberlain met with deputies does not tend to establish Taylor did not later facilitate the assault. Even when read in their entirety, Chamberlain's statements are not relevant to refute the defenses' theory Taylor facilitated the attack and ordered Petrovich to tax Chamberlain. Although they tend to prove Chamberlain was afraid of inmates, the statements do not tend to prove Taylor did not sanction the taxing. That does not end our inquiry, however, as we must

94

determine whether appellants were prejudiced by admission of Chamberlain's statements to Palacios and Chapluk. We conclude they were not.

We review claims the trial court erred in admitting hearsay evidence under the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Harris* (2005) 37 Cal.4th 310, 336.) This was not a close case on the issue of second degree murder as to each appellant. As we explain above, there was strong evidence supporting their second degree murder convictions under all three theories of second degree murder. Three of the appellants, Aguilar, Guillen, and Carlstrom, admitted they assaulted Chamberlain either by putting a pencil in his rectum, hitting him, or kicking him. There was testimony Aguilar and Carlstrom grabbed the bunk for leverage and stomped on Chamberlain. And there was testimony Villafana kicked Chamberlain on his head and torso. There was also testimony Petrovich was the first person to hit Chamberlain. Finally, there was evidence Carlstrom asked Chamberlain for his paperwork, Petrovich authorized the taxing after Chamberlain failed to produce his paperwork, Villafana authorized the Paisanos to participate in the taxing, Aguilar escorted Chamberlain to the location of the taxing, and Guillen willingly participated in the taxing. As we explain above in greater detail, there are no rules when taxing a child molester and everyone in F West was authorized to participate. Contrary to appellants' contention otherwise, this was not a close case on the issue of second degree murder.

Additionally, defense counsel thoroughly cross-examined Chapluk on the contents of the conversation, including that Chapluk claimed he was concerned for Chamberlain's safety but did not bother to check on him when he returned to the guard station at 6:30 p.m. Defense counsels' thorough cross-examination refutes appellants' claim admission of Chamberlain's statements bolstered Chapluk's and Taylor's credibility. Moreover, we are convinced beyond a reasonable doubt Chamberlain's

95

statements did not improperly bolster their credibility because their credibility was severely damaged by evidence of their improper conduct on the job.

Appellants also argue admission of Chamberlain's statements was prejudicial because during closing argument the prosecutor suggested the jury could rely on Chamberlain's statements for the truth of the matter asserted to conclude they were guilty. The trial court properly instructed the jury it could use Chamberlain's statements only on the issue of Chamberlain's state of mind and not for their truth. (CALCRIM No. 303.) And the court instructed the jury that if counsel said anything that conflicted with the court's instructions, the jury must follow the court's instructions. (CALCRIM No. 200.) We presume jurors are intelligent people ""'"capable of understanding instructions and applying them to the facts of the case."'"" (*People v. Casey* (2007) 41 Cal.4th 109, 130.) Appellants also argue the statements were prejudicial as evidenced by the lengthy deliberations and the hung jury. The evidence of appellants' guilt of second degree murder was strong, and once the court removed first degree murder from the jury's consideration, the jury reached its verdicts quickly.

Thus, based on the strong evidence of appellants' guilt, it is not reasonably probable the result of the proceeding would have been different had the trial court excluded Chamberlain's statements. (*People v. Homick* (2012) 55 Cal.4th 816, 871-872 (*Homick*) [erroneous admission of hearsay harmless where strong evidence of defendant's guilt].) Despite the erroneous admission of Chamberlain's statements, their admission added little to a substantial case establishing appellants' guilt.

Finally, appellants claim admission of Chamberlain's statements violated their Sixth Amendment confrontation rights. We disagree. Based on the strong evidence of appellants' guilt, we conclude the error of admitting Chamberlain's statements was harmless beyond a reasonable doubt. (*Homick, supra,* 55 Cal.4th at p. 872.)

## B. *Inmate Paperwork*

Carlstrom contends the trial court erred in admitting Reilly's testimony Carlstrom asked him for his paperwork and inmates taxed him when he failed to produce it because the evidence was irrelevant, unduly prejudicial, and impermissible character evidence. He also claims admission of the evidence violated his federal constitutional right to due process and a fair trial. The Attorney General contends Carlstrom forfeited appellate review of all but his relevance claim, the evidence was relevant to his credibility, the evidence was not unduly prejudicial, and admission of the evidence did not violate his federal constitutional right to due process and a fair trial. Carlstrom responds an Evidence Code section 352 is necessarily included in any relevance discussion, and the trial court and counsel discussed Evidence Code section 1101. We agree with Carlstrom the issue is preserved for appellate review and the court erred in admitting the evidence, but we conclude the error was harmless.

Unfortunately, when ruling the evidence was admissible the court's only justification was "that part is admissible for a variety of reasons." We recognize this was a very long trial, and the trial judge wanted to keep things moving. But in the future, the court's legal basis for admitting evidence on the record would be helpful.

The prosecutor asserted two primary theories supporting admission of the evidence—Reilly's fear and credibility. The prosecutor stated he was relying on Evidence Code section 1101 to some extent but that was not his primary justification. Evidence who asked Reilly for his paperwork was unnecessary to establish his fear. (*Riccardi, supra,* 54 Cal.4th at pp. 815-816 [evidence relevant if tends to prove disputed fact of consequence to determination of action].) It was sufficient that an inmate asked for his paperwork and he was subsequently taxed. Whether the evidence was relevant to Reilly's credibility though is a closer question.

"'An explanation of the basis for the witness's fear is likewise relevant to [his or] her credibility and is well within the discretion of the trial court. [Citations.]'"

(*People v. McKinnon* (2011) 52 Cal.4th 610, 668.)  However, evidence relevant to a witness's credibility may be excluded pursuant to Evidence Code section 352.  (*People v. Wheeler* (1992) 4 Cal.4th 284, 295.)  Trial courts have the discretion under Evidence Code section 352 to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (*Rodrigues, supra,* 8 Cal.4th at pp. 1124-1125.)

Here, although a witness's credibility is certainly relevant, we conclude the trial court erred in concluding the evidence's relevance was not outweighed by its prejudicial effect.  Allowing Reilly to testify who asked for his paperwork, Carlstrom, and that he was subsequently taxed for not providing the documents only served to inflame the jury against Carlstrom because it portrayed him as a bad person.  Thus, the trial court erred in admitting Reilly's testimony concerning who asked him for his paperwork.  That is not the end of our inquiry, however, as we must determine whether Carlstrom was prejudiced by admission of Reilly's testimony.  We conclude he was not.

We review claims the trial court erred in admitting evidence under Evidence Code section 352 under *Watson, supra,* 46 Cal.2d at page 836.  (*People v. Earp* (1999) 20 Cal.4th 826, 878.)  We need not detail again the strong evidence of Carlstrom's guilt of second degree murder.  Carlstrom relies on the fact the prosecutor referred to this evidence during closing argument, and the jury asked the trial court for a read back of the testimony concerning who taxed Reilly.  Neither persuades us admission of Reilly's testimony resulted in a miscarriage of justice where there was strong evidence of his guilt.  Additionally, the jury heard the substance of Reilly's statements from other witnesses' testimony.  Carlstrom admitted he was the Woods mouse.  And Palacios, Corral, and Hurley all testified the CAR mouse approached each new inmate and asked for his paperwork.  Despite the erroneous admission of Reilly's statements, their admission added little to a substantial case establishing Carlstrom's guilt.  We need not

98

discuss Carlstrom's length of jury deliberation's and hung juries claims again. Finally, we reject Carlstrom's claims admission of Reilly's testimony violated due process and denied him a fair trial because Reilly's testimony was not so prejudicial as to render Carlstrom's trial fundamentally unfair. (*People v. Hamilton* (2009) 45 Cal.4th 863, 930.)

## C. OCSD Conduct and Policies

Petrovich, and by virtue of their joinder co-appellants, contend the trial court erred in ruling much of the evidence concerning OCSD policies was inadmissible and the court's rulings denied them due process and a right to a fair trial. We disagree.

In *Nevada v. Jackson* (2013) ___ U.S. ___, [133 S.Ct. 1990, 1992], the Supreme Court of the United States explained: "'[T]he Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense,"' [citations], but we have also recognized that '"state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials,"' [citations]. Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence. [Citations.]"

As a general matter, a defendant has no constitutional right to present all relevant evidence in his favor. (*People v. Gurule* (2002) 28 Cal.4th 557, 620.) In other words, ordinary evidentiary rules do not impermissibly infringe on the defendant's right to present a defense. (*Ibid.*) Thus, courts may ordinarily exclude evidence after weighing its probative value against any unfair prejudicial effect. (*Ibid.*) However, there are instances where due process, the right to a fair trial, and other constitutional guarantees trump the rules of evidence. "For a defendant's constitutional rights to override the application of ordinary rules of evidence, '"the proffered evidence must have more than 'slight-relevancy' to the issues presented. [Citation.] . . . [Citation.] The proffered evidence must be of some competent, substantial and significant value. [Citations.]" [Citations.]' [Citation.]" (*People v. Anderson* (2012) 208 Cal.App.4th 851, 880.) Although a trial court is vested with wide discretion in determining the relevance

of evidence, "a court 'has no discretion to admit irrelevant evidence.'" (*People v. Alexander* (2010) 49 Cal.4th 846, 903-904 (*Alexander*).) Here, the trial court's rulings did not constitute a refusal to allow appellants to present a defense but merely rejected certain evidence concerning their defense.

To support their contention the trial court's ruling violated their constitutional right to present a defense, appellants cite to numerous instances where the trial court sustained the prosecutor's Evidence Code section 402 objections during defense counsels' examination of Chapluk, Kohler, Vasquez, and Mayfield. Defense counsels' line of questioning concerned generally, deputies' use of inmates to control other inmates and whether it was legal, deputies' violations of OCSD policies, deputies' dereliction of duties, and deputies' use of a pepper ball gun to instill fear in inmates. Appellants rely on this proposed testimony to assert the court erred in preventing them from establishing Taylor, Chapluk, and Le created an environment where inmates feared deputies and acted out of fear thus diminishing their culpability because they did not possess the necessary mental intent for second degree murder. We disagree.

First, the trial court's rulings did not constitute a refusal to allow appellants to present a defense but merely rejected certain evidence concerning their defense. There was a plethora of evidence on the points appellants now complain the trial court prevented them from exploring.

After Chapluk agreed OCSD did not permit deputies to meet with shot callers, he testified that if deputies had a problem with an inmate they would go to the shot caller to gather intelligence. Le testified Taylor interacted with shot callers approximately three times a shift and used them to communicate with the inmates. Mayfield testified he saw the deputies meeting with shot callers and saw Taylor taking shot callers through the door. Ibarra testified he saw Petrovich reenter the barracks earlier that day after being outside with Taylor. Chapluk added that deputies knew the shot callers had authority over the other inmates in their CAR, and a shot caller would

100

likely tax an inmate who defied him. Palacios agreed Taylor ran F Barracks like a drill sergeant. Vasquez testified that if a deputy goes to a shot caller regarding a problem inmate, the shot caller will tax the inmate if he is defiant. He also said that if a shot caller defies a deputy, the shot caller will be moved and lose his power. Based on this evidence, the jury could certainly conclude it was a violation of OCSD policy for deputies to meet with shot callers but Taylor regularly violated that policy. The jury could also rely on the evidence to conclude Taylor instilled fear in all the inmates by using the shot callers to control other inmates and by empowering the shot callers and threatening them with loss of privileges.

Additionally, Kohler testified a deputy's duties included patrolling the barracks every 30 minutes to prevent inmates from violating rules. Chapluk admitted neither he nor Taylor did floor checks every half hour the day Chamberlain was killed. Le admitted the deputies did not conduct regular floor sweeps but would rather look out the window and say it was secure. Le was instructed to note in the barracks log every 30 minutes that it was secure if nothing major happened. Chapluk said during the day of Chamberlain's killing Taylor was awake but not doing paperwork or moving around. He also admitted both he and Taylor encouraged inmate behavior that would minimize the writing of reports. Le said deputies would often watch television and movies in the guard station. Finally, Le said deputies encouraged inmates to follow the rules so the deputies would not have to complete paperwork. From this evidence, the jury could reasonably conclude Taylor, Chapluk, and Le regularly violated OCSD policies and were derelict in their duties. There was certainly evidence the jury could rely on to support appellants' defenses, had the jury believed them.

However, as we explain above, there was other evidence demonstrating each appellant participated in the taxing because of deeply rooted jail culture where inmates inflict punishment on other inmates based on among other things an inmate's charges. In jail culture, inmates believed to be child molesters are particularly despised

101

and the rules that apply to normal taxings do not apply. Based on all the evidence, the jury could reasonably conclude appellants' claim they assaulted Chamberlain because they were afraid was highly suspect based on other evidence they willingly participated in a taxing of an inmate they believed was a child molester. Petrovich's claim inmates were powerless to participate in the horrific beating of Chamberlain is belied by the record.

Finally, although Petrovich claims the trial court erred in excluding the above-mentioned evidence, Petrovich completely fails to explain how each piece of evidence satisfied the ordinary rules of evidence. He recounts Chapluk's, Kohler's, Vasquez's, and Mayfield's testimony, counsels' discussions with the court, and the court's rulings, but he does not address relevancy, foundation, or Evidence Code section 352, etc. To conclude the court prevented appellants from receiving a fair trial, we would first have to conclude the evidence sought to be admitted was admissible in the first instance because a trial court does not have the discretion to admit irrelevant evidence. (*Alexander, supra,* 49 Cal.4th at pp. 903-904.) Petrovich has failed to include any reasoned argument concerning how the evidence is admissible under the ordinary rules of evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Nevertheless, we will discuss a couple points that seem particularly relevant to appellants' claims. First, conduct of deputies other than Taylor, Chapluk, or Le was irrelevant to any issue at trial. Second, defense counsel asked a number of witnesses whether deputy conduct violated California law or OCSD policy. Whether deputies acted in conformity with the law or policy was irrelevant to appellants' state of mind. Additionally, the questions impermissibly called for an opinion on a legal conclusion. (*People v. Gray* (2005) 37 Cal.4th 168, 212 [improper for lay witness to give opinion evidence on legal definitions of crimes].) Third, Taylor's use of the pepper ball gun was a major point of contention at trial. But none of the appellants personally saw Taylor fire the pepper ball gun in F Barracks, and thus there was no foundation for the

testimony.  (*People v. Hawthorne* (1992) 4 Cal.4th 43, 57-58 [trial court broad discretion in determining foundational requirements].)  Thus, we conclude the trial court properly ruled the evidence of OCSD conduct and policies was inadmissible and the court's rulings did not violate appellants' rights to due process and a fair trial.

*D.  View of F West Barracks*

Guillen, and by virtue of their joinder co-appellants, argue the trial court erred in denying their motion to view F Barracks because it seriously impacted their ability to accurately describe to the jury how the crime occurred and violated their federal constitutional right to present a defense and for a fair trial.  We disagree.

"Section 1119 provides:  'When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed . . . , it may order the jury to be conducted in a body, in the custody of the sheriff or marshal, as the case may be, to the place . . . , which must be shown to them by a person appointed by the court for that purpose . . . .  A court's ruling on a party's motion for a jury view is reviewed for abuse of discretion [citation], i.e., whether the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice [citation].  'When the purpose of the view is to test the veracity of a witness's testimony about observations the witness made, the trial court may properly consider whether the conditions for the jury view will be substantially the same as those under which the witness made the observations, whether there are other means of testing the veracity of the witness's testimony, and practical difficulties in conducting a jury view.'  [Citation.]"  (*People v. Lawley* (2002) 27 Cal.4th 102, 158, fn. omitted (*Lawley*).)

Here, the trial court did not act irrationally or absurdly in denying appellants' motion to view F Barracks because there were other available means of testing the witnesses' veracity.  Most importantly, the conditions in F West at the time of trial were not "substantially the same" as when inmates killed Chamberlain.  Aguilar

103

escorted Chamberlain to the blind spot in D cube. At trial, the evidence established the privacy walls had been removed, and thus, D cube no longer had a blind spot. The trial court properly relied on this to conclude the jury might be mislead by a viewing and thus, the probative value of a viewing was "diminished." (*People v. Williams* (1997) 16 Cal.4th 153, 213 [where only justification for jury view of crime scene was to view relative distances, denial proper because foliage different at time of trial].)

Additionally, the court properly concluded there were other available means for the jury to assess the witnesses' veracity. The evidence established there were about 300 photographs of F West, most of which were taken within 24 hours of the incident, and the remainder taken within one week. There were diagrams that accurately depicted F West at the time of Chamberlain's death. Based on this evidence, the trial court properly concluded the photographs and diagrams were the closest representation of F West's layout at the time of the incident. (*Lawley, supra,* 27 Cal.4th at p. 158 [photographs and diagrams accurate depiction of crime scene].) Moreover, it was certainly reasonable for the court to conclude a jury view was of little probative value because it would have been problematic to try to recreate the noise level during Chamberlain's killing. Finally, the court properly concluded there were logistical problems with a jury visiting a populated jail. (*People v. Price* (1991) 1 Cal.4th 324, 422 [practical difficulties in conducting jury view].)

Petrovich's suggestion the jury's view of F West is the equivalent of MSNBC's visit to TLJ to film a segment related to this does not persuade us otherwise because MSNBC personnel were not the trier of fact. Thus, because F West was not substantially the same at the time of trial, F Barracks was accurately depicted in diagrams and hundreds of photographs, and there were practical difficulties in arranging a jury view of F West, we conclude the trial court properly denied appellants' motion to view

104

F Barracks and they were not denied their constitutional right to present a defense. (*People v. Linton* (2013) 56 Cal.4th 1146, 1202 (*Linton*) [ordinary evidentiary rules do not impermissibly infringe on accused's constitutional right to present defense].)

*E. Taylor's Statements*

Guillen and Petrovich, and by virtue of their joinder co-appellants, assert the trial court erred in denying their motion to admit Taylor's statements to investigators. Appellants claim there was a "world of difference" between Taylor's statements, and the evidence was relevant for the nonhearsay purpose of Taylor's state of mind and its exclusion violated their federal due process right to present a defense. We disagree.

"'A hearsay objection to an out-of-court statement may not be overruled simply by identifying a nonhearsay purpose for admitting the statement. The trial court must also find that the nonhearsay purpose is relevant to an issue in dispute.' [Citation] Similarly, Evidence Code section 1250, which authorizes the admission of out-of-court statements to prove the declarant's state of mind, permits the admission of such evidence only if the declarant's state of mind 'is itself an issue in the action' or if the evidence 'is offered to prove or explain acts or conduct of the declarant.' [Citation.] 'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."' [Citations.] [¶] Evidence that 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive' is generally admissible. [Citation.]" (*Riccardi, supra,* 54 Cal.4th at pp. 814-815.) A trial court may exclude relevant evidence under Evidence Code section 352. (*Rodrigues, supra,* 8 Cal.4th at pp. 1124-1125.)

Before we address the merits of appellants' claim, we must first determine the disparity between appellants' and the trial court's interpretation of Taylor's statements. In his first interview, investigators showed Taylor a photograph of Petrovich and Taylor quickly agreed he recognized him. Taylor identified the man as the Woods shot caller. Taylor did not identify the man by name.

105

In his second interview, investigators showed Taylor a photograph of Petrovich but it took a bit longer for Taylor to recognize him as an inmate in F West. During this interview when asked whether the inmate in the photograph had an "unofficial title" in F West, Taylor said "no" because that was his first day back to work and there was a different inmate who was the Woods shot caller before he returned to work.

Although we disagree with the trial court there is "not a world of difference between" what Taylor said in his first interview and what he said in his second interview, neither do we agree with appellants there is a "world of difference" between the two interviews. We conclude the truth lies somewhere in the middle.

In any event, we agree with the trial court Taylor's statements have little, if any, probative value. Taylor's statements are of little, if any, probative value on the issue appellants sought to admit the evidence—whether Taylor called Petrovich out of F West and arranged or sanctioned Chamberlain's taxing, which if true, was relevant to the required mental intent for second degree murder. Based on a complete reading of Taylor's statements, we think appellants overstate the significance of Taylor's statements. Appellants suggest the jury could infer from Taylor's "contradictory" statements he had a guilty conscience because he (1) called Petrovich out of F West; and (2) authorized, or at least, sanctioned the assault on Chamberlain. We conclude it is one too many hoops to jump through to conclude Taylor authorized the attack based on his ambiguous statements. Contrary to Petrovich's hyperbolic claim the court's ruling "gut[ted] the defense ability" to prove the plan to tax Chamberlain began with the deputies and not him, the court's ruling simply excluded one piece of evidence that ultimately was too speculative and not relevant to support his defense. Thus, the court properly concluded Taylor's statements had no probative value.

We also conclude the trial court properly exercised its discretion and concluded that because Taylor's statements were of little probative value, it would be an

106

undue consumption of time to admit the evidence. Appellants complain the court's ruling on this point was inconsistent with the general length of the trial and duplicative testimony. Appellants complain admission of this evidence would have taken only a couple hours which in comparison to the length of the trial, was insignificant. It is true the trial was long, and based on our complete reading of the record, there was some repetitive testimony. But the court was certainly within its discretion to conclude that where the proffered evidence had no relevance, any time spent would be a waste of judicial resources. Because we have concluded Taylor's statements were not relevant, we need not address appellants' claim the court should have admitted Taylor's statements for a nonhearsay purpose or under Evidence Code section 1250's state of mind exception. (*Riccardi, supra,* 54 Cal.4th at pp. 814-815 [threshold issue admissibility of evidence is relevance].) Nor do we have to address their claim exclusion of the evidence prevented them from presenting a defense in violation of their federal constitutional rights. (*Linton, supra,* 56 Cal.4th at p. 1202 [ordinary evidentiary rules do not impermissibly infringe on right to present defense].)

## IV. *Jury Instructions*

In his opening brief, Villafana argues the trial court erred in failing to instruct the jury sua sponte on the lesser included offense of voluntary manslaughter based on a killing committed without malice during an inherently dangerous felony. The Attorney General contends the California Supreme Court's decision in *Bryant, supra,* 56 Cal.4th 959, renders this claim meritless. In his reply brief, Villafana concedes the issue.

Additionally, Villafana and Aguilar argue trial court erred in failing to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter based on a noninherently dangerous felony. Guillen and Carlstrom join in their claim. As we explain below, the trial court was not required to instruct the jury sua sponte on

involuntary manslaughter based on a noninherently dangerous felony because there was insufficient evidence supporting that theory.

## A. *Lesser Included Offense of Voluntary Manslaughter*

In *Bryant, supra,* 56 Cal.4th at page 968, the California Supreme Court explained, "A defendant commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter." The court clarified that, "Although we have on occasion employed somewhat different formulations to define the offense of voluntary manslaughter, we have never suggested that it could be committed without either an intent to kill or a conscious disregard for life." (*Id.* at p. 969.) The court stated it had never held "that a defendant may be found guilty of voluntary manslaughter when he kills unintentionally *and* without conscious disregard for life." (*Id.* at p. 970.) The court concluded: "A defendant who has killed without malice in the commission of an inherently dangerous assaultive felony must have killed without either an intent to kill or a conscious disregard for life. Such a killing cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life. To the extent that *People v. Garcia* [(2008)] 162 Cal.App.4th 18 (*Garcia*) suggested otherwise, it is now disapproved. [¶] Because a killing without malice in the commission of an inherently dangerous assaultive felony is not voluntary manslaughter, the trial court could not have erred in failing to instruct the jury that it was." (*Bryant, supra,* 56 Cal.4th at pp. 970-971.)

Villafana concedes *Bryant* is dispositive. The trial court did not err in failing to instruct the jury on the lesser included offense of voluntary manslaughter based on a killing committed without malice during an inherently dangerous felony because it is an incorrect theory of law.

*B. Lesser Included Offense of Involuntary Manslaughter*

Appellants, less Petrovich, argue the trial court erred in failing to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter based on a noninherently dangerous felony, assault with force likely to cause great bodily injury. They argue the record includes evidence from which the jury could reasonably conclude they acted with criminal negligence. We disagree.

"Involuntary manslaughter is manslaughter during 'the commission of an unlawful act, not amounting to a felony,' or during 'the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' (§ 192, subd. (b).) 'The offense of involuntary manslaughter requires proof that a human being was killed and that the killing was unlawful. [Citation.] A killing is "unlawful" if it occurs (1) during the commission of a misdemeanor inherently dangerous to human life, or (2) in the commission of an act ordinarily lawful but which involves a high risk of death or bodily harm, and which is done "without due caution or circumspection."' [Citation.]" (*People v. Murray* (2008) 167 Cal.App.4th 1133, 1140.)

Although the *Bryant* court answered the question whether the trial court was required to instruct the jury sua sponte on voluntary manslaughter, it expressly declined to answer the question whether the court was required to instruct the jury sua sponte on involuntary manslaughter based on a noninherently dangerous felony. The court stated: "We decline to address defendant's alternative contention that because assault with a deadly weapon is not an inherently dangerous felony, the trial court erred in failing to instruct the jury on the theory of involuntary manslaughter recognized in *People v. Burroughs* (1984) 35 Cal.3d 824[, 834] . . . ." (*Bryant, supra,* 56 Cal.4th at pp. 966, 970-971; see *People v. Butler* (2010) 187 Cal.App.4th 998, 1007 (*Butler*) [stating *Burroughs* court defined nonstatutory form of voluntary manslaughter based on noninherently dangerous felony committed without due caution and circumspection];

*Garcia, supra,* 162 Cal.App.4th at p. 29 [recognizing killing in commission noninherently dangerous felony recognized as involuntary manslaughter].)

The parties spend much time addressing the issue of whether assault with force likely to produce great bodily injury is a noninherently dangerous felony justifying an involuntary manslaughter instruction based on the reasoning in *Burroughs* and its progeny. But we conclude there is a more basic reason the trial court did not err in failing to instruct the jury sua sponte on involuntary manslaughter based on a noninherently dangerous felony—sufficient evidence did not warrant such an instruction.

"In a criminal case, a trial court must instruct on general principles of law relevant to the issues raised by the evidence, even absent a request for such instruction from the parties. [Citation.] The obligation extends to instruction on lesser included offenses when the evidence raises a question as to whether all the elements of the charged offense were present, but not when there is no evidence that the offense committed was less than that charged. [Citation.] [¶] . . . However, the 'substantial' evidence required to trigger the duty to instruct on such lesser offenses is not merely '*any* evidence . . . no matter how weak' [citation], but rather "'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]"' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664.)

"The words 'without due caution and circumspection' refer to criminal negligence—unintentional conduct which is gross or reckless, amounting to a disregard of human life or an indifference to the consequences. (*People v. Penny* (1955) 44 Cal.2d 861, 879 . . . .) If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence. By contrast where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice. [Citation.]" (*People v. Evers* (1992) 10 Cal.App.4th 588, 596; *Butler, supra,* 187 Cal.App.4th at pp. 1008, 1014.)

110

Here, the record is devoid of evidence from which a reasonable jury could conclude appellants were guilty of involuntary manslaughter on the theory they were criminally negligent. The evidence detailed above demonstrates each appellant committed an act endangering Chamberlain's life, i.e., each appellant participated in the assault by hitting, kicking, or stomping Chamberlain. Additionally, there was evidence each appellant realized the danger and acted in total disregard of that danger. There was evidence each appellant participated in or was sufficiently aware of the CAR system and that child molesters were despised in jail and there were no rules for taxing child molesters. Based on the record before us, there is no question each appellant knew the risk involved to Chamberlain when they violently attacked him. This was a case where each of the appellants, if he was guilty at all, was guilty of the greater offense of second degree murder and not of the lesser included offense of involuntary manslaughter. Thus, the trial court did not err in failing to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter based on a noninherently dangerous felony assuming that is a legally correct theory of law.

## V. Unanimous Verdict

Carlstrom and Villafana, and by virtue of their joinder co-appellants, contend the trial court deprived them of their right to a unanimous verdict. The Attorney General responds appellants invited the error and forfeited their claim, there was no error, and any error was harmless. As we explain below, we conclude the issue is preserved for appellate view, but there was no prejudicial error.

## A. Invited Error and Forfeiture

The Attorney General argues appellants invited the error and forfeited this claim because Guillen's counsel suggested the alternate juror be provided with the information the jury requested and all counsel agreed. We disagree.

"The right to a unanimous verdict is constitutional in nature and must be *personally* waived by the defendant. 'A jury may be waived in a criminal cause by the

consent of both parties expressed in open court *by the defendant and* the defendant's counsel.' [Citation.] 'A waiver of the right to a jury trial requires an express waiver *by the defendant* in open court. [Citation.] "Waiver by counsel is not sufficient . . . ." [Citation.]' [Citation.] '[C]onsent to a jury of fewer than 12 persons must be expressed by the defendant in open court. [Citations.]' [Citation.]" (*People v. Garcia* (2012) 204 Cal.App.4th 542, 552.)

Here, the trial court did not obtain each appellant's *personal* consent. Additionally, a substantial right of the appellants is implicated. (*People v. Renteria* (2001) 93 Cal.App.4th 552, 560 (*Renteria*) [counsel's failure to request CALJIC's version of CALCRIM No. 3575 does not bar defendant from asserting the point on appeal because affected defendant's substantial right].) In any event, it is within our discretion to address a forfeited claim to avoid the inevitable ineffective assistance of counsel claim. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 92 (*Coffman and Marlow*).) Thus, we will address the merits of appellants' contention.

B.  *Unanimous Verdict*

In *People v. Collins* (1976) 17 Cal.3d 687 (*Collins*), disapproved on another ground in *People v. Boyette* (2002) 29 Cal.4th 381, 462, footnote 19, the California Supreme Court held the right to trial by jury under the California Constitution (Cal. Const., art. I, § 16) includes "the requirements that a jury in a felony prosecution consist of 12 persons and that its verdict be unanimous." (*Collins, supra,* 17 Cal.3d at p. 693.) The Supreme Court noted those requirements are part of the broader right that "requires each juror to have engaged in all of the jury's deliberations. . . . The requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus through deliberations which are the common experience of all of them. It is not enough that 12 jurors reach a unanimous verdict if 1 juror has not had the benefit of the deliberations of the other 11. Deliberations provide the jury with the opportunity to review the evidence in light of the perception and memory of each member. Equally

112

important in shaping a member's viewpoint are the personal reactions and interactions as any individual juror attempts to persuade others to accept his or her viewpoint.  The result is a balance easily upset if a new juror enters the decision-making process after the 11 others have commenced deliberations.  The elements of number and unanimity combine to form an essential element of unity in the verdict.  By this we mean that a defendant may not be convicted except by 12 jurors who have heard all the evidence and argument and who together have deliberated to unanimity." (*Ibid.*)

*Collins* construed section 1089, which provides for substitution of alternate jurors, to require "that deliberations begin anew when a substitution is made after final submission to the jury.  This will insure that each of the 12 jurors reaching the verdict has fully participated in the deliberations, just as each had observed and heard all proceedings in the case." (*Collins, supra,* 17 Cal.3d at p. 694.)  Accordingly, *Collins* interpreted "section 1089 to provide that the court instruct the jury to set aside and disregard all past deliberations and begin deliberating anew.  The jury should be further advised that one of its members has been discharged and replaced with an alternate juror as provided by law; that the law grants to the People and to the defendant the right to a verdict reached only after full participation of the 12 jurors who ultimately return a verdict; that this right may only be assured if the jury begins deliberations again from the beginning; and that each remaining original juror must set aside and disregard the earlier deliberations as if they had not been had." (*Collins, supra,* 17 Cal.3d at p. 694.)  "[T]he substance of this instruction is mandatory when an alternate is substituted onto the jury after deliberations have begun." (*Renteria, supra,* 93 Cal.App.4th at pp. 557, 559.)

In *People v. Odle* (1988) 45 Cal.3d 386, 405 (*Odle*), abrogated on another ground as stated in *Prieto, supra,* 30 Cal.4th at page 256, a juror was replaced with an alternate juror after deliberations commenced.  The trial court advised the reconstituted jury that it was to start its deliberations "'from scratch *so that [the alternate juror] has full benefit of everything that has gone on . . . up to the present time*.'" (*Odle, supra,*

113

45 Cal.3d at p. 405, italics added.)  The California Supreme Court ruled the italicized language improperly *implied* the jury should not disregard previous deliberations but should instead attempt to bring the new juror up to speed on the matters already discussed and possibly decided.  (*Ibid.*)  The *Odle* court explained that interpretation would defeat the purpose of the *Collins* instruction requiring jurors to begin deliberations anew.  (*Ibid.*)

Here, based on a complete reading of the trial court's statements, we conclude the court improperly implied the jury should not disregard previous deliberations.  After the court clerk swore in the alternate juror, the court stated it had received the jury's request for read back of testimony.  But those requests were from the original jury.  By having the testimony read back, the court answered the original jury's request despite the fact one juror was excused and the alternate juror did not participate in the deliberations that led to the requests.  Although the court then instructed the jury with the proper instruction, CALCRIM No. 3575, which included the directive the alternate juror must fully participate in the deliberations, the court's prior statements, like in *Odle*, *implied* the jury should not disregard previous deliberations but should instead attempt to bring the alternate juror "up to speed" on the matters already discussed and possibly decided based on the requests the original jury submitted to the trial court.

Although we are not presented with the identical situation the *Odle* court faced where the trial court expressly stated the new jury should have the "full benefit of everything that has gone on . . . up to the present time," the court's ruling allowing the read back of testimony the original jury requested had the same effect because it suggested to the jury it resume deliberations where the original jury left off.  (*Odle, supra,* 45 Cal.3d at p. 405.)  We agree with appellants that when the new jury was impaneled, the original jury's requests were "moot" and "a legal nullity."  The better practice would have been for the trial court to inform the newly impaneled jury the original jury's requests were void, jury deliberations were to begin anew, and the court would consider all requests from the newly impaneled jury.  That is not the end of our

114

inquiry, however, as we must now determine whether the appellants were prejudiced. We conclude they were not.

*C. Prejudice*

We review the error under the prejudicial error test set forth *Watson, supra,* 46 Cal.2d at page 836. (*Collins, supra,* 17 Cal.3d at p. 697 & fn. 5.) "In determining whether *Collins* error was prejudicial, we may consider whether the case is a close one and compare the time the jury spent deliberating before and after the substitution of the alternate juror. [Citations]." (*People v. Proctor* (1992) 4 Cal.4th 499, 537 (*Proctor*) [explaining that in both *Collins* and *Odle* evidence was overwhelming and deliberation prior to substitution of juror was minimal compared to deliberations after substitution].)

In *Proctor, supra,* 4 Cal.4th at page 536, the jury retired to deliberate and, after less than one hour, recessed for the day. The following morning, before further deliberation, a juror called in ill and an alternate juror was chosen. The trial court advised the jury to resume deliberations, "stating it 'would be helpful and in connection with commencing your deliberations again, that you kind of start, start from scratch, so to speak, so that [the alternate] has the benefit of your thinking as well as give him an opportunity for his input also.'" The jury returned a verdict two and one-half days later. (*Id.* at p. 536.) The *Proctor* court found a lack of prejudicial error, citing the strong evidence against defendant, and the short amount of time the jury deliberated before the substitution and the lengthy deliberations after the substitution. (*Id.* at pp. 537-538.)

In *Renteria, supra,* 93 Cal.App.4th at page 557, the trial court failed to instruct the jury with CALJIC No. 17.51 after seating an alternate juror. The trial court submitted the case to the jury at 11:35 a.m. At 3:00 p.m., the jury sent the court a note stating it was unable to reach a verdict. A few minutes later, one of the jurors stated she was ill and was unable to continue. The court replaced the ill juror with an alternate juror and deliberations resumed, after being instructed only to "'go back into the jury room and continue your deliberations.'" (*Ibid.*) The alternate had been permitted to be in the jury

room during its earlier deliberations but was under an instruction not to participate. Thirty minutes after deliberations resumed, the jury returned with guilty verdicts and true findings on the special allegations. (*Ibid.*) The *Renteria* court concluded there was error and it was prejudicial. In concluding the error was prejudicial, the court relied on the fact the evidence against defendant was not overwhelming and the jury had deliberated for a few hours before a substitution was made but reached a verdict only 30 minutes after it was made. (*Id.* at pp. 560-561)

In *People v. Martinez* (1984) 159 Cal.App.3d 661, 663, 666, the trial court substituted a juror after two and one-quarter hours of deliberations. The court admonished the jury stating, "'Now that there is a new member of the jury, the jury will resume their deliberations starting over with the new trial juror. [¶] The trial jury may return to the jury room.'" (*Id.* at p. 664.) The *Martinez* court concluded the trial court had not properly admonished the jury to begin its deliberations anew. (*Id.* at p. 665.) And the court concluded the error was prejudicial because the issues concerning premeditation and malice were complex and the case was "close" and the jury deliberated for enough time before deliberations (*Ibid.*)

We disagree with appellants' argument this case is more like *Martinez* and instead conclude it is more like *Proctor*. First, this was not a close case on the issue of second degree murder as to each appellant. As we explain above, there was strong evidence supporting their second degree murder convictions under all three theories of second degree murder. Second, like *Proctor* the duration of deliberations *prior to* substitution of the alternate juror was minimal compared to deliberations *after* substitution of the alternate juror. It is true that in *Martinez* there were lengthy deliberations after the substitution and the court concluded the amount of time before substitution of the alternate "was sufficient time to formulate the danger that is likely without the proper instruction." (*Martinez, supra,* 159 Cal.App.3d at p. 666.) Again though *Martinez* was a *close* case. This was not. Third, the broad nature of the read back

of testimony did not provide the alternate juror with any indication of the jury's previous deliberations.

Finally, we think it important the newly constituted jury deliberated for nine days and was unable to reach unanimous verdicts as to each appellant on the issue of first degree murder. The jury foreperson indicated the jury had not voted on second degree murder as to any of the appellants. It was not until the court removed first degree murder from the jury's consideration that it was able to deliver guilty verdicts on second degree murder. Thus, appellants' claim they were denied the right to a unanimous verdict is meritless because it is not reasonably probable the outcome of the trial would have been different had the trial court not answered the original jury's requests.

*VI. Fines*

Aguilar and Petrovich argue the trial court erred when it imposed $240 restitution fines when it intended to impose $200 restitution fines. The Attorney General concedes the error.

Section 1202.4, subdivision (a), states that when a person is convicted of a crime, the trial court must order a defendant to pay a restitution fine unless the court finds extraordinary and compelling reasons for not doing so. Section 1202.4, subdivision (b)(l), formerly provided that the minimum allowable restitution fine for a felony was $200, with a permissible maximum of $10,000. (Stats. 2011, ch. 45, § 1, eff. July 1, 2011.) The minimum was raised to $240 beginning January 1, 2012, to $280 beginning January 1, 2013, and to $300 beginning January 1, 2014, while the maximum has remained at $10,000. (Stats. 2011, ch. 358, § 1, eff. Jan. 1, 2012.)

The trial court imposed a $200 restitution fine on Guillen pursuant to section 1202.4, subdivision (b)(1). The court did not impose a parole revocation fine because Guillen will be on parole for life. The court later sentenced both Petrovich and Aguilar and imposed $240 restitution and parole revocation fines. Their abstracts of judgment correctly reflect the trial court's imposition of fines in the amount of $240.

117

Two months later, the court sentenced Carlstrom. In imposing the restitution fines, the court stated: "[Carlstrom] is ordered to pay a state restitution fine in the amount of $200. I'm going to impose a minimum fine in this case. I think all of these defendants are going to be treated equally. My recollection is each defendant received a $200 restitution fine. And that's under [section] 1202.4[, subdivision] (b)(l)." The court also imposed a $200 parole revocation fine. The following month, the court sentenced Villafana and also imposed $200 restitution and parole revocation fines. In doing so, the trial court said, "Pursuant to . . . section 1202.4[, subdivision] (b)(1), the court imposes a restitution fine, and I'm going to give the same restitution fine here that I did in the other cases. And my recollection is I imposed a minimum restitution fine of $200."

Although it was within the trial court's discretion to impose higher restitution and parole revocation fines when sentencing Aguilar and Petrovich, the court's statements at Carlstrom's and Villafana's sentencing hearings are inconsistent with the fines imposed. Because it appears the trial court intended to impose the same fines on each appellant, $200, we modify Aguilar's and Petrovich's restitution and parole revocation fines in the amount of $200. (*People v. Smith* (2001) 24 Cal.4th 849, 854.)

*VII. Cumulative Error*

Appellants argue the cumulative effect of the errors requires reversal. We conclude there were two evidentiary errors and the error concerning the court's statements on the requirement of unanimity. However, we conclude appellants were not prejudiced by the cumulative impact of the errors because as we explain above there was strong evidence of appellants' guilt of second degree murder. Thus, the errors were not individually or cumulatively prejudicial. (*Coffman and Marlow, supra,* 34 Cal.4th at p. 128.) Therefore, their claim has no merit.

DISPOSITION

We modify the judgments as follows: Aguilar's and Petrovich's restitution and parole revocation fines are modified in the amount of $200. The clerk of the superior

118

court is directed to prepare the amended abstract of judgments consistent with this opinion and forward them to the Department of Corrections and Rehabilitation, Division of Adult Operations.  As modified, the judgments are affirmed.


O'LEARY, P. J.

WE CONCUR:


RYLAARSDAM, J.


FYBEL, J.

# APPENDIX A



COPIES TO:
OCSD HOMICIDE
COR 06-05918AO

AGENCY:
OCSD

ORANGE COUNTY SHERIFF-CORONER
IDENTIFICATION BUREAU

FR NUMBER:
06-55048

CASE NUMBER:
06-195263

| Forensic Specialist G.R. JACKSON, Sr.F.S. | | Date of Report 12/12/2007 | Approved by K. Robinson 12-13-07 | Page 3 of 7 |
|---|---|---|---|---|

002682

11878

120